WM. TACKABERRY COMPANY, Appellant, v. SIMMONS WARE-
HOUSE COMPANY et al., Appellees.

**NEGLIGENCE:** Act of God—Unprecedented Floods. An unprece-
1 dented flood may constitute an ''act of God'' as that term is used in law. Evidence reviewed and held to show that the flood in question was, as a matter of law, unprecedented and therefore an act of God.

**WATERS AND WATERCOURSES:** Bridges—Construction—Duty of
2 Authorities to Anticipate Floods—Negligence. The unreasonable is never required; for instance, a city, in the construction of its bridges, is not required to anticipate and provide for unprece-dented floods and debris carried thereby, which could not reasona-bly have been foreseen.

PRINCIPLE APPLIED: Action against a city and another defendant on the claim that a bridge constructed by the city and a conduit in connection therewith were negligently constructed and a nuisance, in that it was inadequate in size and thereby caused an overflow with consequent damage to plaintiff. The evidence traced the flood conditions of the region through a period of some fifty years, and revealed the fact that at no prior time had the region been visited by a flood of as great magnitude

as the one in question. The bridge in question had been constructed much larger than appeared necessary and proved sufficient to care for all floods prior to the one in question. There was evidence that the bridge and conduit, as constructed, carried a greater volume of water than would have been carried along the natural condition of the banks. *Held,* the evidence showed that the flood was unprecedented, and that the city was not negligent in not providing for it.

**NEGLIGENCE: Act of God—Concurring Negligence.** Negligence of man may so intermingle with an act of God as to fix responsibility for damages when but for such negligence the plea and proof of an act of God would be a complete defense, but such negligence must be proximate; that is, it must appear that the injury would not have happened but for such negligence. *Held,* the principle had no application because negligence was not shown.

**MUNICIPAL CORPORATIONS: Reasonable Care—Duty to Exercise —Good Faith Reliance on Expert Advice—Bridges.** A city must exercise reasonable care in building its bridges; in other words, it must avoid negligence. It is not required, however, to secure the impossible, i. e., absolute perfection of human wisdom in its servants and agents; therefore, if, in the building of a bridge, it secures the services of a competent and skilled engineer, and in good faith adopts his plans and builds accordingly, it performs its full duty to exercise reasonable care and is not liable for resulting damage, until time and experience have given it notice that the bridge is in fact insufficient. So held in case of a bridge which had, prior to the flood in question, proven of sufficient capacity to care for all waters.

**MUNICIPAL CORPORATIONS: Adopting Plans of Engineer—Variation Therefrom—Effect.** A city adopting in good faith the plans for a bridge drawn by a competent engineer is not deprived of the protection which the law extends to such commendable care by the fact that in building the bridge certain modifications or additions are made which in no wise contributed to the injury of which complaint is made.

PRINCIPLE APPLIED: A city built a bridge under plans drawn by a competent engineer. In the actual building, a concrete slab was substituted in place of a former sidewalk for foot passengers and certain steel girders were installed which were not in the plans. The girders did decrease the opening under the bridge. A flood, the largest known in some fifty years, proved too great for the capacity of the bridge and overflowed the surrounding street and flooded plaintiff's property.

Up to this time, the bridge had cared for all floods. Had the girders not been installed, the overflow would, nevertheless, have occurred. *Held*, the city was not liable.

*Appeal from Woodbury District Court.*—HON. JOHN F. OLIVER, Judge.

MONDAY, MAY 10, 1915.

ACTION for damages for flooding the basement of plaintiff's business room and the destruction of merchandise by water alleged to have been diverted from Perry Creek by obstructions which were alleged to have been placed therein by the defendants. It was also asked that the nuisance thus maintained be abated. The cause was tried to a jury. At the close of plaintiff's evidence, the court sustained a motion to direct a verdict for the city. The motion was based upon numerous grounds, one, and perhaps the chief, of which was upon the claim of the defendant city that the bridge was constructed by it in its governmental capacity, from plans drawn by a competent engineer and adopted by the city. At the close of all the testimony, the court sustained a motion to direct a verdict for the other defendant. This motion was on numerous grounds. But it seems to be conceded that the chief ground of the ruling was the claim that the storm and flood was such an unprecedented one as to constitute an act of God. Plaintiff appeals.—*Affirmed*.

*M. L. Sears* and *Edwin J. Stason*, for appellant.

*F. L. Ferris* and *Lewis S. Haslam*, for appellee, Simmons Warehouse Company.

*A. C. Strong, F. E. Gill, Sam Page* and *Schmidt & Pike*, for appellee, City of Sioux City.

PRESTON, J.—The case has been here before, 154 Iowa 358. As originally brought, the suit was against eighteen other defendants. The former appeal was from a ruling sus-

taining motions by defendants to separate on the ground that the allegations of the petition did not show a joint liability. That motion was sustained by the district court and affirmed in this court.    In a supplemental opinion on the former appeal, it was suggested that, if plaintiff should choose to confine its petition against the two present defendants to an alleged cause of action wholly joint, and to eliminate therefrom all allegations upon which several liability can be predicated, it might be done.    On the case being remanded, plaintiff filed a substituted petition as against the two present defendants, by which it sought to charge a joint liability.    When the case came on for trial again, these defendants again filed motions to separate, which were overruled.    The substituted petition, as did the original petition, charged that the defendants were maintaining a nuisance by obstructing the creek, and also charged them with negligence.    A somewhat extended abstract of the allegations of the original petition is set out in the opinion on the prior appeal, and we shall endeavor not to repeat what is there set out, but simply refer to the former opinion.    As to the alleged joint liability of the defendants, the substituted petition alleges, substantially, that the defendant city was wilfully, carelessly, negligently and improperly maintaining, in conjunction with and as a part of a single and continuing structure with the structure of its co-defendant hereinafter described, a large iron bridge in and across said creek, in such a manner as to materially lessen the capacity of said stream and to prevent the water thereof from flowing in its usual channel into the Missouri River; and, in connection with said bridge, the said defendant was similarly maintaining a closed apron to the south of the bridge and closely joined with it, in such manner as to prevent overflow water from the creek from returning to the channel thereof.    Similar allegations are made as to the defendant, Simmons Warehouse Company, in regard to a cement conduit. The defendants filed separate answers, denying the allegations of the petition, admitting the existence of their struc-

tures, alleging that each structure was erected and maintained independent of the other, and setting up other defenses which will be referred to in the course of the opinion.

The case is now here for review upon the testimony introduced. The determination of the case turns largely on the

question whether, under the undisputed evidence, the flood which caused the damage to plaintiff, and which occurred July 10, 1909, was an unprecedented one. Though the testimony on this branch of the case had not been introduced, except as it was brought out in plaintiff's case in chief, at the time the court sustained the motion of the defendant city for a verdict, it was one of the defenses of the city that the

flood was unprecedented, and that defense is common to both defendants.

It would not be practicable to attempt even to set out any considerable part of the testimony within the proper length of an opinion. We are abundantly satisfied from a reading of the entire record and the elaborate and carefully prepared arguments of counsel that it was such a flood as is contended for by defendants.

A large plat was introduced in evidence, showing the meanderings of the creek within the city limits and the different streets over which the water came from the north. We here set out a part of this plat, showing the immediate situation of plaintiff's property, the bridge in question at Fourth Street and West Third Street, the property and conduit of the Simmons Company and the creek at this point, the pile bridges of the Milwaukee Railway and the bridge of the Sioux City Service Company just below the conduit in question. These pile bridges are referred to by some of the witnesses as forming a letter V.

There are other bridges of other companies and of the defendant crossing this creek above Fourth Street, and three railway bridges below. The railway embankment south of plaintiff's property is about two feet high. The creek has numerous bends within the city. Commencing at West Ninth and Fourteenth Streets, the creek runs east for about a block, then southeast, then south about half a block, then southwest, then southeast, then sharply to the southwest, or nearly west, then turns in a large bend and runs northeast to a point between Eleventh and Twelfth Streets, then nearly south, then southeast, then south, and at Ninth Street nearly west, turning in a bend to the east again, crossing Pearl Street, on which plaintiff's property is situated, between Eighth and Ninth Streets, then southwest again, crossing Pearl Street and running then southwest about four blocks. This bend extends west of Water Street about a block and a half, then runs southeast, then south to the bend shown in the plat.

Plaintiff's property is at the lowest point. The ground slopes towards the creek for a little distance back. The properties of plaintiff and the defendant Warehouse Company are in the business district. Some of the buildings above Fourth Street are built on the edge of the creek.

A map was introduced in evidence, showing the drainage area of this creek. It shows 72 square miles; length 24 miles; length of channel 37 miles; average fall 4.5 feet per mile. Other plats were introduced in evidence, showing the construction of the bridge and conduit in question, also a large number of photographs showing the destruction caused by this flood and the general situation.

1. Taking up now the question of fact as to whether there was an unprecedented flood on July 10, 1909, and without going too much into detail, we shall attempt to describe in a general way the conditions as they existed. It is substantially conceded by counsel for plaintiff that the rainfall was unprecedented above the city, for they say in argument that it is not claimed that there was not an unusual and extraordinary, if not an unprecedented, rainfall in the Perry Creek valley ten or fifteen miles from Sioux City, neither is it claimed that there was not, at the source of the creek, and in the farming section through which the creek flowed in its upper reaches, an unprecedented volume of water, nor that at some points within the city limits there was not an unprecedented amount of flood water accumulated in parts of the creek valley, although the evidence does not show that there was any rainfall within the city limits. But they contend that the defendants failed to show, by that weight of evidence that warranted the court in directing a verdict for them, that the overflow of the creek between Sixth Street and the Fourth Street bridge was due to an unprecedented amount of water or rainfall which at any time reached that locality, and that it was the overflow there that caused the damage. They contend that the overflow was not due to an unprecedented vol-

1. NEGLIGENCE: act of God: unprecedented floods.

ume of water at that point, but was due wholly to the obstruction placed and maintained in the creek channel by the defendants; also, that the flood waters from the north, by spreading out in the low lands and being held back by trees and vegetation, bridges and other obstructions, reached and were able to reach the neighborhood of the defendants' obstructions only in such volume as, if the channel had been unobstructed by the defendants' structures, would have passed to the Missouri River, with only the overflow, if any, into the streets and alleys of such quantity of water as is often found therein after a heavy rain, and which would have been taken care of by gutters and catch basins, without material damage to anyone.

With these contentions of plaintiff we are unable to agree. It is shown by undisputed evidence that a large amount of water fell in a short time and over a limited area. A large number of witnesses were introduced on this point by defendant, Simmons Warehouse Company, as to flood conditions both north of the city for some miles and within the city and south to the Missouri River, at the time in question, and as to prior high waters for forty-seven or forty-eight years. Plaintiff introduced no witnesses in rebuttal of this evidence. There is testimony as to high water in 1858, and another about 1869. But substantially all the witnesses are agreed that the high water of the year 1908 was, up to that time, the highest water along this creek ever known. One witness, an old resident, describes the bridge on his farm and says that the bottom of the stringers of the bridge is one foot above any prior high water mark. The stringers are twelve inches and the railing three feet high. In the flood of 1909, the water was three feet above that and was a mile wide. Prior to that, the water never got to the floor of the bridge. Prior to 1908, he had never seen this creek out of its banks along where he lived.

Another witness says that the flood of 1908 could not be compared with the flood of 1909. He had never seen the

debris as high by flood waters as it was in the flood of 1909.

Another witness who had lived on this creek for thirty years describes his granary, eighteen by twenty-four feet, which was situated on the highest ground, twenty or twenty-five rods from Perry Creek, which was filled with grain, and carried by the flood of 1909 down stream more than a quarter of a mile across the fields. A photograph of this granary and the place where it lodged was introduced in evidence, and the witness says:

"Exhibit 17 is my granary, and Exhibit 18 shows the tree where we got the granary. From my place down to where the building was found is half a mile of what is generally bottom; the whole thing was a sea of water. The water was four or five feet deeper than I ever saw it before."

Another witness testifies that the highest flood since 1879 was that of 1908, and the 1909 flood at his place was six or seven feet higher than that in 1908. He says:

"Along between eight and nine o'clock the flood came out of the north, and I did not know it was raining. It did not rain at my place; it raised fast; I started to wade out and it rose in ten or fifteen minutes from my knees to my chin. There were no trees around there that would stop any water."

Another witness who had lived on the creek for thirty-three years says:

"The largest flood I ever saw in Perry Creek was the one in 1909. My buildings were set about forty rods from Perry Creek; the flood of 1909 floated my cow barn and hog houses out and took away all my stock yards, cleaned it off as clean as a floor; no flood was ever up to my yards before. I measured the trees on the bank of the creek to where the mud and stuff would lodge and there was sixteen feet of water; I have never seen it over two or three feet before."

Other witnesses testify as to conditions above the city. A resident of the city for thirty-nine years, describing the condition of the water in the city, says:

"The largest amount of flood water I have ever seen come down Perry Creek was the rain of 1909; the next highest was in 1908. There was no comparison between these floods where I lived in Sioux City. The one of 1908 did not run past me at all, and the one of 1909 the water was like a river. I never saw the creek out of its banks before 1908. The flood of 1908 came within two feet, or such a matter, of the girders of that bridge at Fourth and West Third Streets, but the 1909 flood went right over the top of it."

Another resident of the city for twenty-one years says:

"The flood of 1909 was a great deal larger than that of 1908. The flood of 1908 came within half a block of the pumping station and the flood of 1909 extended beyond the station to half a block farther south. I saw people out in it waist deep around the corner of West Sixth and Main Streets; there was a strong current."

Another witness, living on Twelfth Street for twenty-four years, says:

"The greatest amount of flood water I ever saw come down Perry Creek was in 1909. The next greatest was the year before. In 1909 it was about twenty-two or twenty-three inches higher than in 1908."

Another witness, living on Omaha Street some ten or twelve blocks northwest of the bridge and conduit in question, says he made a notation of highest point of the water in 1908, and when the water was the highest in 1909 he measured it and found a difference at that place of twenty-seven inches; that is, the flood of 1909 was twenty-seven inches higher than the flood of 1908, and he testifies that the flood of 1908 was

greater than anything he had ever seen before; that at the fire house on West Seventh Street the water was four and one-half feet deep, and in 1908 it was a little over his ankles at that point.

Another witness, who had lived in Sioux City for thirty-nine years, and who lived on Water Street about two blocks north of the bridge and conduit in question, and whose place of business was at Fourth and Water Streets, says:

"There was a lot of water came out of Sixth and Lynch Streets on Water Street; the current was very rapid; never saw water flow down Water Street before the flood of 1909; never saw it out of the banks between Fifth and Fourth Streets before. During the flood of 1908 I observed the water passing under the Fourth and West Third Street bridge. It went through very easily; there was no damming or holding back."

Other witnesses describe the water coming from the northwestern part of the city in a southeasterly direction, and state that it went across the creek north of Fourth Street.

Another witness, who has lived near Perry Creek for forty-five years, says:

"The flood of July 10, 1909, was the biggest flood I ever saw. The bridge and conduit in the flood of 1908 took care of the water that came down Perry Creek."

Other witnesses give like testimony. Witness Skeels, who was formerly assistant city engineer, was a witness for plaintiff. It was stipulated that he was an experienced and capable engineer. He testifies:

"Since the flood of 1909 I have made a survey, with a view of ascertaining the extent of flood waters at various points on Perry Creek. The point nearest to the source of the stream at which I made a cross section is about fifteen miles north of the city. Exhibit 28 shows the length of that

cross section to be 800 feet. The superficial area of the cross section of the flood at that place was 2,960 feet; in that cross section the little cup which appears in the left of the picture represents the channel of the creek. The width of the creek at that point from high bank to high bank was practically 100 feet. The area of the capacity of the channel of the creek at that point is between four and five hundred feet, or about one-sixth. From the examination of Exhibit 28, a channel would be required to carry these flood waters, without overflow of the creek, in 1909, at that point, approximately fifteen feet deep and two hundred feet wide.''

He testifies as to other cross sections north of the city:

''The next cross section I made was on Main Street at West Sixth and another at Fifth Street just west of Water Street; the width of the flood waters there was 1,800 feet; the area of the cross section of the flood was 3,811 feet. There is also a comparative cross section of the channel on the south line of Fifth Street; the width shown from bank to bank of Perry Creek at that point is thirty-four feet; an area of 539 feet is shown, which represents the utmost carrying capacity of the stream at that point, without overflow.''

Plaintiff's witness Ford noticed the flood in 1909 at two o'clock in the morning. He says:

''The water at half past two was out of the banks at the Pearl Street bridge where the land was low, and at that time there was a lot of water over on West Seventh Street.''

The point described by the witness is about five blocks north of plaintiff's property and on the same street. He says further:

''At five o'clock I first noticed the water coming across up on Sixth and Park; that would be east of the creek; went to the Fourth Street bridge about six o'clock. As soon as the

water broke across Water Street I went directly to the bridge to see what was wrong; the water came across Water Street between five and six o'clock; the first water that came on Water Street came off of Park at Sixth; the creek could not carry it and it flowed down Park Street; some went down Water.''

The point just referred to is two blocks north and a little west of the bridge and conduit in question. Witness continues:

''After the water came out of the alley about 150 feet north of the Fourth Street bridge, I visited the bridge as as soon as it broke across, at that time the Fourth Street bridge was running clear. After that I went to the corner of Third and Pierce, Second and Pierce, Third and Pearl, Second and Pearl, Third and Water, and opened up the catch basins. It might have been six o'clock when I got back. When I went to open up the catch basins at Third and Pierce the water was about eight inches deep. At Third and Douglass it was so deep that I couldn't find the lift to the manhole.''

It is two blocks east and one block south of appellees' structures to Third and Douglass Streets and three blocks east and one south to Third and Pierce Streets. According to the testimony of this witness, the water had not yet flowed over the Fourth Street bridge, because he had testified that at that time the Fourth Street bridge was running clear. The witness further continues:

''After getting breakfast I got back to the Fourth Street bridge a little after seven. The water was then flowing over the top of the Fourth Street bridge. The water that came out on to Water Street between Fifth and Sixth divided and most of it went down to Fourth and Water. . . . Not any of the water that went east of Park Street got back into

the creek unless some of it flowed down Water Street. The flood waters west of the creek came down in the direction I have described and went back into the Perry north of the Sixth Street bridge. The creek could not carry it all at the Sixth Street bridge. The Sixth Street bridge got choked up with stove wood and all kinds of rubbish, and that is why that flood came over this way instead of going down Perry Creek. The water went straight across on account of the dam at the bridge. . . . I think the flood of 1909 was positively the largest flood we have had since I have had any remembrance of the city.''

It is contended by appellees: ''That a flood of unprecedented volume was precipitated into Perry Creek and came down into the city, a wall of water, with the rush of a tidal wave, as shown by the testimony, and practically undiminished, as shown by the cross section of the water works station on Main Street, which is but a few city blocks above the said bridge at Sixth and West Fourth Streets.''

Between the latter point just mentioned and the city bridge and the conduit complained of, the appellant claims that the flood was not unprecedented, and that, if the banks had been unobstructed and open, no overflow would have occurred. Without again setting out the cross section areas at these points, we are satisfied from the record that the creek, unobstructed, could not have carried the volume of water at Fourth Street. It seems to us, under the evidence, that at no point between the place where the storm occurred and the outlet of the Simmons Warehouse Company's conduit was the bed of Perry Creek of sufficient capacity to carry the flood waters precipitated into it. And it seems to us quite clear that the structures of the defendants did not cause the damage to plaintiff. It is shown without dispute that an unusual amount of debris was carried down the creek and that it lodged against the piling of the different bridges above and below the bridge and conduit complained

of. The witnesses say that there was more debris than they had ever seen before. The bridge and conduit complained of carried all the water brought to them until debris lodged in and against them. It is shown that an entire building lodged against the bridge and a part of the roof of another building.

A witness for plaintiff, who was interested in the property across Water Street east from the Simmons Warehouse Company, testified:

"After the bridge completely choked is when the water rose the highest there until they opened the bridge again. I think it was about eight o'clock, between seven and eight, that it got up to the highest. I wouldn't say it was that building that blocked the upper end of the bridge, but it was the debris that practically choked the bridge."

Q. "And that is what threw the water out in the largest quantities in and about where you are interested?"

"Plaintiff objects as calling for a conclusion of the witness, incompetent and immaterial."

Court: "He may answer whether that threw the water out."

"Yes, I think it was the stoppage of the channel there."

It is shown that they attempted to open up the bridge by the use of block and tackle and hauling out the debris with teams.

It is not contended by defendants that the bridge and conduit would have carried all the flood waters of this flood, for their utmost carrying capacity and the utmost carrying capacity of the wide-open banks of the creek would not have done so.

Perhaps we should refer to the testimony of the witness who was city engineer at the time the bridge and conduit were constructed, although it has a bearing on a point to be considered later. This witness testified that he had lived in Sioux City for forty-six years, and during all that period

had good opportunity for observing Perry Creek; that before the bridge complained of was built, he gathered what data he could as to prior high waters; that they made a great many inquiries from persons that had lived along the creek for thirty or forty years; that he had measured the volume of high waters for several years preceding the building of the bridge; that he thought they were leaving an ample opening; that they kept measurements of all high water; that the plans were drawn with that in view as sufficient to carry all known flood waters; that the bridge was made 33⅓% larger than the largest amount of water he had known to go down the creek prior to that time; that afterwards, when the conduit of the defendant Warehouse Company was built, the plans were submitted to him; that he considered them ample to carry all the flood waters that came down the creek; that the flood of 1909 exceeded all floods he had ever known; that the next one in volume was that of 1908, but that the flood of 1909 exceeded the other; that at the time of the flood of 1908 he observed the water passing through the city's bridge and this conduit, and that the water passed through there freely in that flood; that there was no overflow of water anywhere that he knew of in that vicinity.

It is contended by appellant that the creek was narrowed at and above the Fourth Street bridge, and that the city was negligent in this respect, and thereby obstructed the flow of the water. But one of plaintiff's witnesses testified, and it is not disputed, that because of the smooth cement walls of the conduit and the walls of the buildings above the bridge, the openings would carry a third more water than the natural, uneven banks of the creek.

There is some speculation in the evidence as to how timbers might act in being carried down in a flood of this character. Plaintiff also complains that the girder on the up stream side of the conduit was too low, and that because, during the flood of 1908, the water came up to, or nearly to, this girder, it was notice to the city and its co-defendant of

the alleged nuisance. But it would seem that a complete answer to this is that these openings did readily carry the flood of 1908, and this flood of 1908 was, up to this time, the highest known. Ordinarily, the question as to whether the flood was an unprecedented one is a question for the jury, but it is not, of course, always so. Where the physical facts and conditions, as shown by all the evidence, are such that the minds of reasonable men could not differ, it becomes a question of law for the court.

We have not attempted to set out all the evidence. But, as before stated, we are satisfied from the entire record that the high water of July 10, 1909, was unprecedented and,

2. WATERS AND WATER-COURSES: bridges: construction: duty of authorities to anticipate floods: negligence.

therefore, an act of God, and that a verdict for plaintiff, had the case been submitted to the jury, could not be sustained. The rule of the cases is that defendants are not bound to provide for unprecedented floods, but must anticipate and make provision for such floods as may occur in the ordinary course of nature. They must foresee and provide for unusual storms such as occasionally occur, whether they be called ordinary or extraordinary, but they are not required to provide for a flood which is not only extraordinary but unprecedented, and could not reasonably have been foreseen. This is the rule, as we understand it, whether defendants are charged with negligence or whether they are charged with maintaining a nuisance by obstructing the stream.

In addition to this, as to the defendant city, is the question as to whether it would not be relieved of responsibility in any event, because in building its bridge it adopted the plans of a competent engineer. This matter will be referred to later in the opinion.

The defendants would not be liable for the result of the clogging of the bridge and conduit by buildings and debris which it could not have been anticipated would be carried down by the water.

2. Appellant contends that, even though the high water was unprecedented, where negligence concurs with the act of God in producing an injury, the party guilty of the neg-

3. NEGLIGENCE: act of God: concurring negligence.

ligent act is responsible, provided the injury would not have happened but for such negligent act; that, while defendants could not in general be held for injury caused by an unusual and excessive rainfall, yet if the rainfall itself would not have run into plaintiff's basement and injured its property except for the careless and negligent conduct of appellees in failing to provide a bridge and conduit of sufficient capacity, defendants are liable.

Appellant concedes that before this rule will apply, it must be found that the defendants were negligent and that, but for their negligence, the injury would not have happened; that negligence is not a proximate cause unless it be found that the injury would not have happened but for that negligence. The defendants do not dispute plaintiff's legal proposition at this point, but they contend that there is no negligence shown. The only negligence charged in the petition is that the bridge and conduit as constructed are not large enough to carry the water which the defendant should have anticipated.

For the city, it is further contended that, where a city council has in good faith adopted the plans and specifications for a bridge, prepared by competent and skilful engineers,

4. MUNICIPAL CORPORATIONS: reasonable care: duty to exercise: good faith reliance on expert advice: bridges.

who were at the time of its construction and prior thereto and thereafter familiar with the drainage area and conditions of the creek over which it was built, and who prepared their plans in the exercise of their best judgment and skill, and the bridge was constructed in accordance therewith, the city cannot be held liable, even though damage does result by reason thereof. That this is true, even though in the honest exercise of judgment it is not made of sufficient capacity to avoid injury, citing, among other cases: *Van Pelt*

*v. City of Davenport,* 42 Iowa 308; *Bowman v. Humphrey,* 124 Iowa 744; same case 132 Iowa 234; *Hoehl v. City of Muscatine,* 57 Iowa 444; *Ferguson v. Davis County,* 57 Iowa 601; *Knostman, etc. v. Davenport,* 99 Iowa 589; *Houghtaling v. Railway,* 117 Iowa 540; *Walters v. Marshalltown,* 145 Iowa 457.

5. MUNICIPAL CORPORATIONS: adopting plans of engineer: variation therefrom: effect. Plaintiff insists now in argument that the plans of the engineer were not adopted by the council. The following stipulation was entered into upon the trial:

"It is agreed that Exhibit 14 is considered in evidence. It is further agreed by and between the plaintiff and the defendant, city of Sioux City, that J. M. Lewis and G. Y. Skeels, city engineer and assistant city engineer, during and prior to the year 1903, were competent and skillful civil engineers, and were at the time of the construction of the Perry Creek bridge at Fourth Street, and prior thereto and thereafter, familiar with the conditions of Perry Creek and the drainage area, and that in the exercise of their best judgment and skill they prepared the specifications for the construction of Perry Creek bridge believing the same sufficient and proper, and that the city council in good faith adopted the plans and specifications in the manner as shown by defendant's Exhibit 14 and constructed the bridge in accordance therewith, but the plans and specifications did not include the steel girders or concrete slabs or apron extension subsequently placed upon the south ends of the bridge abutment in the manner and under the circumstances as shown by the evidence introduced."

The testimony of the engineers, heretofore referred to, was that the plans were based upon data they had gathered and observations and that, in their opinion, the structures as built were amply sufficient. The concrete slab referred to as not being a part of the plans was used in place of a former sidewalk for foot passengers over the creek. We are unable

to see that this could have anything to do with obstructing the passage of water under the bridge. The girders have been before referred to, and, while they doubtless did decrease the opening, yet the structures with the girders in did safely carry the high water of 1908. Under the evidence, we are clearly satisfied that, without these, the creek would not have carried the high water of July 10, 1909, and that, without them, plaintiff's property would have been flooded.

It is also contended by appellant that the rule that the city is not liable where it adopts the plan of a competent engineer does not apply where the city is causing a nuisance. Sewer and other cases are cited to the effect that, where the natural result of the structure is to injure the property of others, the city is liable, even though built upon plans of a competent engineer. In this case, if, after the bridge had been constructed under proper plans, it had been demonstrated by experience that it was not sufficient, the city would doubtless be liable after notice. Such is not the situation here. The bridge and conduit had proven sufficient for all prior high water. As before stated, plaintiff claims that the flood of 1908 was notice that the structures were not sufficient; but, as before shown, that was up to that time the highest flood, and the structure took care of that flood without injury to property. Whether it is called negligence or a nuisance, in so far as building its bridges of sufficient height and width to permit passage of water is concerned, the city is charged with the duty to use due care to build large enough. And this is based upon past experience as to rainfall, drainage area and other circumstances. The concession is that the council acted in good faith in adopting the plan. It is now contended otherwise in argument, but we find nothing in the record to show that the council acted in bad faith or that they were reckless or shut their eyes to known danger from flooding.

As to the Simmons Warehouse Company, the evidence already recited shows that the flood of 1909 was unprecedented and such as the defendants were not required to anticipate

and guard against. As stated, the only complaint alleged is that the openings were not large enough.

3. What has been said renders it unnecessary to discuss the question as to the joint liability of the defendants. The legal phase of that question was fully discussed upon the prior appeal under the pleadings as they then stood. The holding now is that neither defendant is liable because of the unprecedented character of the flood, and there is no negligence of either defendant shown which concurs with the act of God in causing the injury to plaintiff, and further, as to the city, that it in good faith built its bridge based upon plans of a competent engineer.

4. Plaintiff relies on a statement in the opinion in the case of *Sioux City v. Simmons, etc. Co.,* 151 Iowa 334, at 339, to the effect that the conduit was insufficient in size and faulty in construction. It is claimed by counsel for appellees that such statement was by reason of a misapprehension of the record in the former case. However this may be, and if it be true there was evidence in the former appeal to sustain such a finding, that evidence does not appear in this case. This case must be determined upon the evidence introduced here, and not upon the evidence in another trial where the parties are not the same.

Some other questions are argued, but those discussed are controlling. From a careful examination of the entire record, we conclude that the action of the trial court was right and in accordance with law and the facts in this case. The judgment is, therefore,—*Affirmed.*

DEEMER, C. J., LADD and EVANS, JJ., concur.