## Staunton.

## DIRECTOR-GENERAL OF RAILROADS, AND CAROLINA, CLINCH-FIELD AND OHIO RAILWAY V. BRYANT'S ADM'R.

### September 16, .1920.

1. MASTER AND SERVANT—*Floods—Act of God—Servant Drowned by Washing Away of Building on Master's Premises.*—In an action for the death of an employe of a railroad company, which occurred by drowning when a privy erected on an embankment and overhanging a stream was washed away during an unusual freshet in the creek, the accident appeared to have been due either to a change of the current of the stream whereby the force of the water and logs were cast against the bank on which the building rested and against the corner posts, resulting in an abnormally excessive erosion of the embankment and in sweeping away the corner posts, or the accident was due to the abnormal flow and speed of water. In either event no negligence could be charged to the railway company, unless in erecting and maintaining the building it was charged with the duty of anticipating that such a freshet as that which occurred at the time of the accident was likely to occur. Whether the railway company was chargeable with such duty depends upon whether the circumstances of the case, the flood in question, falls within the category of an "accidental" or "extraordinary" flood, *i. e.,* whether in legal contemplation it was an "act of God."

2. FLOODS—*Extraordinary Flood.*—An extraordinary flood is one which men of ordinary prudence would not have anticipated and provided for. A flood is not extraordinary which is such as residents of the neighborhood might expect from their observation.

3. ACT OF GOD—*Definition.*—The term "act of God," in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them.

4. MASTER AND SERVANT—*Floods.*—A railroad company acted with reasonable prudence and forethought in supposing that a building which withstood unmoved all the freshets which came for four years. and which it was reasonable to suppose would have

withstood the highest of all previous freshets which had oc-
curred in the stream within the knowledge of any of the wit-
nesses examined, covering a period of twelve years, would
withstand all subsequent freshets which were to be reasonably
expected.

5. MASTER AND SERVANT—*Floods—Inspection of Building.*—A rail-
road company was held to have discharged its duty in the
exercise of reasonable care where at reasonable intervals it
inspected a building, and upon a recent inspection before the
accident found the structure to be in a safe condition.

6. MASTER AND SERVANT—*Safety of Building—Reasonable Care.*—
What is reasonable care under the circumstances of the erec-
tion and maintenance of a building for the use to be served
in the instant case, where the structure itself was relatively
temporary, its use not necessary, or enjoined as a duty, but
was to a certain degree optional, with the whole situation to
a great extent, although not entirely, as obvious to the deceased
as could have been ascertained by the railway company by
inspection, might not be reasonable care under other circum-
stances.

Error to a judgment of the Circuit Court of Russell
county, in an action of trespass on the case. Judgment for
plaintiff. Defendant assigns error.

*Reversed and dismissed.*

In this case the defendant in error obtained a verdict
and judgment in the court below against the plaintiffs in
error for the death of C. N. Bryant, an employee of the
railway company, which occurred by drowning. The latter
will be hereinafter referred to as the deceased.

There is no conflict in the testimony in the case which
involves the credibility of witnesses. Indeed, there cannot
be said to be any conflict on any material point in any of
the evidence which consists of definite statements of wit-
nesses.

Looking then to all of the evidence in the record, as we
must do in such case under the present statutory rule on
the subject (Code 1919, sec. 6363), we find that the ma-
terial facts are as follows:

The deceased had been in the employment of the railway company something over twelve months prior to his death, as assistant hostler, doing certain work about the engines on the yard of the company, located in a mountainous section. The yard is small, is located between the hills, and on one side of the yard flows a small stream, known as Lick creek. The original channel of the creek ran through the narrow bottom between the hills, but in order to obtain as much level space for the yard as practicable, when the yard was constructed the railway company moved the channel of the creek over to the foot of the hill, on one side of the bottom, by cutting a new channel for the creek with a steam shovel and threw up an embankment on the opposite bank from the hill, which embankment extended some distance away from the side of the channel next to the said yard.

This embankment, or fill, was composed of rock and dirt in a mixture of something like fifty per cent. each.

For the use of its employes working on said yard the railway company, about four years prior to the death of the deceased erected, at a point on said embankment, a privy, 10 x 12 feet in size. The original construction of this privy was as follows: A place in said embankment was cut down making an opening on the embankment, two or three feet in depth, which was something over ten feet in width, leveled to receive the privy building. Two pieces of timber, 10 x 12 inches x 16 feet long, were laid on this foundation, at right angles with the creek, projecting five feet over the channel of the creek, and far enough apart for the sides of the building to rest upon. A small building, formerly used as an oil-house, 10 x 12 feet in size, strongly constructed, was moved from another location and placed on said foundation so that the sides of the twelve-foot length of it rested on the said timbers, and the ten-foot width of it extended to and from the ends of the timbers,

which projected over the channel five feet as aforesaid, thence upon the timbers aforesaid over the embankment foundation for a space of seven feet. Under the ends of the timbers which projected over the channel, and hence, under the two rear corners of the building were placed two upright pieces of timber, 10 x 10 inches about four feet long, which rested at the foot on sills of timber 8 x 12 inches x 4 feet long, set in the bottom of the channel. The upright corner pieces were well secured or fastened, both to the building and foot-sills, with forty penny nails, which, as the record states, are nails about four and one-half inches long. The building as thus placed originally projected five feet over the channel of the creek, and seven feet of it was supported by the embankment as aforesaid. This position of itself, if the 10 x 10 inch x 4 feet upright timbers had not been put under the rear corners, would have ensured that the building would not topple over into the creek so long as the embankment stood at that width under the building, and a question in the case is whether the railway company relied on the embankment not washing away and remaining sufficiently wide under the building to secure it, or whether it relied, and if so whether it could, in the exercise of reasonable care in the premises, rely upon the corner posts aforesaid to support the building and prevent its toppling as aforesaid. The testimony for the railway company on this point is that as originally constructed the building was secure from such toppling without the rear corner posts, but that they were put in and fastened as aforesaid "to make it (the building) more secure." And the testimony for the railway company is to the effect that it relied upon the corner posts to keep the building secure from toppling into the creek as well as upon the embankment. That it had the building regularly inspected once every three months. That when last inspected by the regular inspector of buildings and bridges

about two months previously to the death of the deceased, that inspector considered it "very secure;" and that the section foreman, whose duty it was also to inspect such buildings, was in it more or less every week, had used it and seen it a week or ten days before the death of the deceased, and "considered it in good condition and safe. At those times only about a foot of the embankment under the foundation of the building had washed away, leaving the building projecting about six feet over the channel of the creek and resting only six feet on the embankment. That is to say, it was evenly balanced on the edge of the bank of the creek, so far as the weight of the building was concerned, leaving however, the counter weight, due to the sixteen-foot foundation timbers not being evenly balanced, to hold the building in place. This was the condition of the building on the day before the accident presently to be described—which is as near to that event as the evidence discloses such condition; and this had been its condition for an indefinite length of time previously. The embankment had washed away only about one foot, as aforesaid, during the four years the building had stood there. Just precisely when such erosion occurred, the evidence fails to disclose. The theory of the defendant in error is that it was gradual.

A gradual erosion during the four-year period. If so, there was an annual normal erosion of the embankment of about three inches; and unless there was something abnormal about the freshet, which was on at the time of the accident, to cause an excessive erosion at that time, it was not reasonably to be expected that such freshet would have washed away enough of the embankment to have endangered its toppling into the creek, even if there had been no rear corner-posts support. However, as aforesaid, the evidence shows that the railway company relied on such supports as well as the embankment to keep the building secure.

Now it is true that a witness for the defendant in error, testifying on the subject of how far the building extended over the channel of the creek as the building was originally constructed stated, "I don't think over a foot or two;" and the section foreman, a witness for the railway company testified on the same subject as follows: "* * * * this building had been extended two or three feet over this bank, possibly." But neither of these witnesses attempted to be accurate in these statements, nor does it appear that they had accurate information on the subject. But the carpenter who constructed the foundation and placed the building orig- inally, testified positively that the extension of the building over the channel of the creek was originally five feet, and we are satisfied that such must have been the fact.

In the interior of the building there was an opening about three feet in width, across the back end of the building, so that one entering it could plainly see whether the corner posts were in place, and the height of the water in the creek.

The water of the creek, when in its ordinary flow, did not come up on the rear corner posts, being only a few inches deep (about five inches) and about fifteen to twenty feet wide, and the current of the stream, or the relative depth of the bottom of the channel elsewhere, caused the water in ordinary tide, to flow away from said posts, so that at such times the water did not touch even the bottom of the posts. But there were frequent freshets during which, after the erection of the building, the water came up several feet on the corner posts and subjected them to the impact of such logs and other debris as were borne by such floods. On a certain morning the deceased entered the building aforesaid, and it toppled over into the creek, and the build- ing with him in it, was carried down the stream and he was drowned.

There was an unusually high freshet in the creek at the

time, which however the deceased well knew existed before he entered the building. The water in the creek did not reach the body but came up within about two feet of the bottom of the building. This was higher than the water in the creek had ever before gotten within the knowledge of any of the witnesses, speaking from their acquaintance with the locality and the history of the stream extending over a period of twelve years. And there were a great many logs, railroad ties and other debris being carried down the stream, and it was flowing at the rate of something like forty miles an hour, as estimated by one witness. But in previous ordinary floods of the stream, while the water had not been so high, yet it had been high enough to go up on the corner posts of the building and expose them to the impact of the logs and debris, as aforesaid, and on some of such other occasions a greater quantity of logs, and other debris had been seen carried down the stream, than were carried by the flood at the time of the accident. And the ordinary floods of the stream had been frequent during the four years the building had stood.

The testimony does not disclose that the corner posts were ever moved or loosened prior to the accident aforesaid. Nor is there any direct testimony in the record showing that any more of the embankment was washed away by the freshet whose flood was up when the accident occurred than had been washed away previously; nor that the corner posts were moved by such freshet. But we assume that the circumstances of the toppling of the building into the creek establishes the fact that both of these events occurred.

There is testimony in the record to the effect that a brace which extended from the building to the foot of one of the corner posts aforesaid, had been broken and left unrepaired, and that a stump had lodged against the building, which had been allowed to remain there, both for a considerable length of time before the accident. But the testimony for the rail-

way company, which was uncontradicted, explained that the brace was originally put there for the mere temporary purpose of holding the parts until the building was put in place and the posts had been secured with the nails as aforesaid; that the brace served no useful purpose after that, and, hence, was not replaced when it became broken. And there is no evidence tending to show that the broken brace or the stump contributed in any way to the toppling over of the building.

Moreover there is no evidence showing what was the cause of the moving of the corner posts, without which the building could not have fallen, except the existence of the freshet and the features aforesaid which accompanied it.

*Burns & Kidd* and *Morison, Morison & Robertson,* for the plaintiffs in error.

*Finney & Wilson* and *M. M. Long,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

There are numerous assignments of error, but in the view we take of the case it is necessary for us to consider but one question raised thereby, and that is as follows:

1. Is there any evidence in the record to support the verdict of the jury in finding that the railway company was guilty of any negligence which was the cause of the fall of the building into the stream, which resulted in the death of the deceased by drowning?

We are of the opinion that the question must be answered in the negative.

In the first place, if we infer from the circumstantial evidence (consisting of the existence of the freshet and its ac-

companying features at the time of the accident), that an erosion of the embankment was caused by the freshet, which left the building dependent upon the corner posts for support; and also that the corner posts were moved or swept away by the freshet, we are still left by the evidence uninformed as to what feature of the freshet caused the abnormal erosion of the embankment or moved the posts. Was such result due to a change of the current of the stream whereby the force of the water and logs and other debris carried thereby, which normally may have been carried over some other part of the channel, were cast against the bank on which the building rested and against the corner posts, resulting in an abnormally excessive erosion of the embankment and in sweeping away the corner posts? The evidence leaves this question unanswered. But this must be true. Either there was such a change of current of the stream, or there was not. If there was not such a change of current, we cannot account for an abnormal erosion of the embankment, or for a carrying away of the posts which had theretofore withstood unmoved the impact of the logs and other debris of the frequently occurring normal freshets during a period of four years, unless these results were due to the abnormal volume and speed of water at the time of the accident, which abnormally eroded the embankment and cast the logs and other debris with abnormal force against the posts and thus swept them away. For the evidence is that while the volume of water of the freshet at the time of the accident was greater than that of any preceding freshet to which the embankment and posts had been exposed, the quantity of logs and other debris was less than they had been exposed to in other frequently occurring freshets during the four year period aforesaid. Therefore, if there was not such a change of current, there is nothing in the evidence to show that the railway company, in the exercise of reasonable forethought, should have anticipated

that there was any danger of the embankment being so washed away as to destroy the equilibrium of the building or of the posts being moved, by the freshet which occurred at the time of the accident; unless the railway company was charged with the duty of anticipating that such a freshet as this which occurred at the time of the accident was likely to occur.

If then there was such a change of the current, there is nothing from which any negligence of the railway company can be inferred, unless the evidence shows that the railway company could have reasonably anticipated that the current would so change. Now on the latter question, the evidence shows that the normal current of the stream, prior to the freshet at the time of the accident, was toward the opposite bank from that on which the building was located. And, from the fact that the corner posts were not carried away during the four years they had stood as aforesaid, it seems reasonable to conclude that the current of the stream in the freshets during that period was in that direction and carried the logs and other debris and the main force of the water in such direction. If then the current changed, it must have changed during the progress of the last freshet. If so, to what cause was the change due? The evidence is silent as to this matter also. If there was such a change, and if it was due to any cause for which the railway company was responsible, or of which it had such foreknowledge, actual or constructive, as rendered it negligent in the premises, the evidence fails to disclose it. And under the circumstances, in the absence of such proof, we must assume that no such proof could be furnished.

[1] So that whether the current of the stream changed, or did not change, it is plain that no negligence in the premises can be imputed to the railway company, unless in erecting and maintaining the building it was charged with the duty of anticipating that such a freshet as that which occurred at the time of the accident was likely to occur. Now

whether the railway company was chargeable with such duty depends upon whether under the circumstances of the case before us, the flood in question falls within the category of an "accidental" or "extraordinary" flood, *i. e.*, whether in legal contemplation it was an "act of God."

[2, 3] As laid down in 2 Farham on Waters and Water Rights (1904), section 577a, p. 1840: "An extraordinary flood * * * is one which men of ordinary prudence would not have anticipated and provided for. A flood is not extra-- ordinary which is such as residents of the neighborhood might expect from their observation. The rule is stated by the Alabama court as follows: 'Floods such as from climatic and geological conditions may reasonably be expected, whether of frequent or infrequent occurrence must be taken into consideration in estimating hazard attending the obstruction of water courses. The term "act of God," in its legal sense, applied only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them. And that rule must be regarded as the proper one.' "

[4, 5] Applying such rule of law to the facts of this case, we are of opinion that the flood in question was such an "extraordinary flood" that the railway company in erecting and maintaining the building aforesaid was not charged with the duty of anticipating that it was likely to occur. It acted with reasonable prudence and forethought in supposing that a construction which withstood unmoved all the freshets which came for four years, and which it was reasonable to suppose would have withstood the highest of all previous freshets which had occurred in the stream within the knowledge of any of the witnesses, covering a period of twelve years, would withstand all subsequent freshets which were to be reasonably expected. The railway company took care, by periodic inspection, at reasonable intervals, in view of the character of the building and the use which it served, to keep informed as to whether the strength of the original

structure was maintained. Upon recent inspection before the accident, the structure was found to be in as safe condition as it was when originally erected, and likely to continue so as long as the rear corner posts were kept secure in the same way they had been and were then secured. So far as disclosed by the evidence, there was nothing then or at any time to indicate that the posts did not remain up to the time of the accident as securely fastened as when they were originally placed under the building. Thus the railway company, in our opinion, fully discharged its duty in the exercise of reasonable care in the premises.

[6] We are not called upon in this case to decide whether under circumstances such as the erection of a structure on which the safety of passengers depends, or under other circumstances, a railway company would exercise reasonable care if it relied upon the history of a stream and climatic and other conditions of a locality for a preceding period as short as twelve years, in making provision against the effects of floods in the future. What is reasonable care under the circumstances of the erection and maintenance of a building for the use to be served in the instant case, where the structure itself was relatively temporary, its use not necessary, or enjoined as a duty, but was to a certain degree optional, with the whole situation to a great extent, although not entirely, as obvious to the deceased as could have been ascertained by the railway company by inspection, might not be reasonable care under other circumstances.

In no aspect of it, in the instant case, do we find any evidence in the record to show that the railway company was guilty of any negligence which was the cause of the fall of the building which resulted in the death of the deceased.

The verdict of the jury and judgment under review will therefore be set aside and annulled; and, as it seems to us that the facts before us are such as to enable us to attain the ends of justice by final judgment upon the merits, the case will be dismissed.

*Reversed and dismissed.*