PEEL ET AL., RESPONDENTS, *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO., APPELLANT.

(No. 7,051.)

LAMBERT ET AL., RESPONDENTS, *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO., APPELLANT.

(No. 7,050.)

MONTANA RODEO & SPORTS ASSOCIATION, RESPONDENT, *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO., APPELLANT.

(No. 7,052.)

(Submitted April 27, 1933. Decided May 22, 1933.)

[22 Pac. (2d) 617.]

Mr. *R. F. Gaines* and *Messrs. Murphy & Whitlock,* for Appellant, submitted a brief; *Mr. A. N. Whitlock* argued the causes orally.

336

*Mr. A. G. Shone* and *Mr. H. L. Maury,* for Respondents, submitted a brief; *Mr. Maury* argued the causes orally.

MR. JUSTICE STEWART delivered the opinion of the court.

These are appeals from three judgments awarding damages to Joe Peel et ux., Percy Lambert et ux., and the Montana Rodeo & Sports Association, for losses suffered when, on July 30, 1931, their premises were flooded by reason, they allege, of the negligence of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company in failing to maintain sufficient openings in its railroad embankment to permit the free drainage of the watershed drained by what is called the "Sand Ditch." The complaints in the three actions are similar, except as to allegations of damage, and the cases were consolidated for trial.

The main line of the defendant railroad company passes through Silver Bow county. About five miles south of Butte the railroad crosses what the evidence shows to be a natural watercourse. This watercourse, which is dry in its lower reaches during a great part of the year, drains a watershed the area of which is approximately 2,280 acres. The track of the railroad crosses this watercourse on a dirt or sand fill. In this fill were two 48-inch culverts, placed therein to permit the drainage of the watershed.

The plaintiffs allege several acts of negligence: (1) That the openings were insufficient by reason of their size to carry off the water which would naturally be expected to flow down

the watercourse. (2) That the culverts were inadequate by reason of their nonalignment with the direct line of the current. (3) That the culverts were insufficient in that they were not properly reinforced with concrete collars, but imbedded in loose sand. (4) That the culverts did in fact become clogged with debris. There is no evidence to prove the fourth allegation of negligence, and for that reason we may disregard it.

The defendant denied negligence and proximate cause, and as an affirmative defense alleged that on July 30, 1931, there was an unusual and unprecedented flood, which was the cause of the damage. The defendant also set up several statutes of limitations which are not material here, inasmuch as they were declared inapplicable in the recent case of *Heckaman* v. *Northern Pacific Ry. Co.*, 93 Mont. 363, 20 Pac. (2d) 258, 262.

The record discloses that on July 30, 1931, a severe rainstorm, or so-called cloudburst, occurred in the vicinity immediately south of Butte, and particularly in the watershed drained by "Sand Ditch." This region is subject to cloudbursts and the resulting floods and freshets. Several witnesses testified to this fact. One of them said, "We usually have a cloudburst up there every summer," and "there have been quite a few washouts * * * . It has been twenty-five years since I first became acquainted with the country out there, and I mean there have been half a dozen or more washouts and heavy rainfalls." There is no conflict in the evidence as to this fact.

It is clear, however, that the storm of July 30, 1931, was extraordinary and unprecedented. Two witnesses living about two miles up "Sand Ditch" from the railroad fill C C 661, the one in question, testified that the worst storm they had experienced prior to July, 1931, occurred twenty or twenty-two years prior to that time. One of these witnesses, who resided in the same place in 1931, testified: "I speak of those two as being the worst. The one in 1931 looked to me a good deal worse than the one twenty-two years ago."

Another witness, who had lived in the vicinity since 1912, said: "I had lots of trouble up around my place the 30th day

of last July. There is no comparison in the amount of water I saw that day as compared with water I have ever seen before up there; at least eight or ten times more than I ever see. I had never seen high water up there before; we had big storms but nothing like that.'' This witness further testified that whereas other storms had impaired the road to Butte, which he continually used, by washing out highway bridges and culverts, this storm had rendered the road absolutely impassable.

Another witness living in the immediate vicinity said: ''I had never seen anything like it up there before in the twenty-two years I have been there. There were some storms but not like that one.'' A witness from the same region testified: ''I never at any time in my experience living in that neck of the woods saw anything like that. It was the largest storm I ever saw. * * * I never saw anything like that in all the twenty-five years I lived up there. It was the worst I ever saw, nothing come close to it.''

Reverend James J. Sherrin, a witness who was out in a large part of the storm, characterized it as a ''deluge of rain,'' and the stream a mile and a half below the Five-mile House he denominated ''a raging torrent.'' On cross-examination he was asked the following question: ''You spoke of a deluge. It was no deluge as set forth in the biblical writ that Noah encountered? A. I wasn't with Noah at that time, so I couldn't testify to that. If Noah had any heavier it would be too bad for him.''

Any fair consideration of all the evidence in the case indubitably must lead to the conclusion that the storm was of unusual, extraordinary and unprecedented violence. No precedent for it is disclosed in the record. One noteworthy storm occurred twenty or twenty-two years previous to the one under consideration. That one, however, did not approximate this one. So far as the record is concerned, there never was a similar downpour in the region, either before or after the construction of the railroad grade. Likewise, the record is entirely devoid of testimony showing any other instance of

water backing up from the culvert. All the testimony is to the effect that the drainage facilities met the requirements until the day of the storm in question. In the light of the facts, therefore, the results of the storm, in contemplation of law, were acts of God. (*Lyon* v. *Chicago etc. R. Co.*, 45 Mont. 33, 121 Pac. 886; 27 R. C. L. 1106.)

It is important to have in mind the fact that the railroad ▉ existed by authority of law, and therefore could not be held a nuisance *per se*. The mere fact that it did have a grade and maintained culverts across the channel did not constitute negligence, if the same were constructed and maintained in conformity with statutory requirements. (Sec. 8645, Rev. Codes 1921; *Bray* v. *Cove Irr. Dist.*, 86 Mont. 562, 284 Pac. 539.)

In the *Heckaman Case,* supra, this court declared the law of Montana relative to the duty of a railroad corporation to provide sufficient drainage facilities through its embankments. The court there said: "However, it was the primary duty of the defendant corporation, under the common law, in the construction of its embankment, to make sufficient and proper provision for the passage of the waters of the stream, and to that end it was required to bring to the planning and execution of the work the skill and knowledge which are ordinarily practiced in such matters, and to construct it so as to allow for the passage of such water as was known to flow in the stream in times of usual freshets and such as might have reasonably been expected to in floods which are not usual, but which experience shows might occur at any time. (2 Farnham, Waters, sec. 569; 13 Am. & Eng. Enc. Law, 2d ed. 690; *Jones* v. *Seaboard Air Line Ry. Co.*, 67 S. C. 181, 45 S. E. 188; *Price* v. *Oregon Ry. Co.*, 47 Or. 350, 83 Pac. 843, 844. This common-law duty is crystallized into statutory form in this state." The court further said: "Where, as here, a railroad corporation acts under statutory authority, it is not an insurer against damage, but is liable only for failure to exercise the required skill and care to avoid causing injury;

in other words, liability attaches only upon a showing of negligence.''

When a railroad corporation constructs and maintains culverts and bridges which are in fact insufficient properly to provide for the passage of such waters as are reasonably to be expected, then it violates the statute (Rev. Codes 1921, sec. 6507, subd. 5) and by virtue of such violation becomes negligent *per se*.

Since these actions are based upon negligence, the first inquiry must be: Was there sufficient evidence of the inadequacy of the culvert to accommodate such waters as were reasonably to be expected to flow in Sand Ditch, to warrant the jury in finding, as a matter of fact, that the defendant had violated the statute?

The history of this fill shows that in 1908 the defendant installed a wooden culvert with an opening of 22½ square feet. This culvert remained until 1921, when it was replaced by two concrete culverts with a combined area of 27½ square feet. These latter drains remained in place until washed out by the flood of 1931.

The plaintiffs introduced no evidence to show that there had ever been a freshet or flood which the culverts were unable to handle. Witnesses for the defendant who were acquainted with the operation of the culverts testified that at no time during their history had they failed to function adequately. There is nothing to show that any storm prior to 1908 would have exceeded their capacity. There is no controversy as to these facts.

Plaintiffs called to the stand an engineer who told the jury that, according to a certain engineering formula, the area of the openings of the culverts sufficient to drain the watershed in question should be not less than 47.75 square feet. This formula is based upon a certain root of the area of the watershed multiplied by a certain constant. The value of this constant in the formula varied between 1 and 4, depending upon the topography of the watershed, etc., the area of 47.75 square feet being determined by giving the constant a value of one in

the application of the formula. According to another formula, the area of the drains should have been not less than 55 square feet.

Bearing in mind the rule that the defendant was obliged to provide for the "passage of such water as was known to flow in the stream in times of usual freshets and such as might have been reasonably expected to in floods which are not usual, but which experience shows might occur at any time," we are led to ask: Did these engineering formulae raise a conflict in the evidence upon which to justify a finding of negligence in providing inadequate culverts? We think not, in view of the history of this drainage area.

Engineering formulae of the nature of the one in question are based upon the experience of engineers gained through long observation of natural conditions. A particular formula is founded upon the aggregate experience of engineers over a long period of time and under a wide variety of conditions. Formulae relating to the sufficiency of openings in a drainage system are in reality but predictions as to the amount of water which may be expected to pass out of a catchment basin of a given area. The flow from a particular watershed depends upon the topography of the watershed, the nature of the soil, the amount of vegetation, and upon such meteorological factors as humidity, air currents, and barometric pressure. Since the railroad was under a duty to build bridges and culverts sufficient to accommodate the flow reasonably to be expected in a particular watershed, the history of that watershed, and not watersheds in general, should be the guide. The very fact that a formula is but a statement of average expectation admits the possibility of variance in particular cases, and for that reason we say that there is no conflict in the evidence as to the fact that the culverts were sufficient to accommodate the reasonably expected flow.

Many courts have declared that the history of a watershed is a vital factor in determining the sufficiency of a culvert or bridge to accommodate the reasonably expected flow. (*Chicago, R. I. & Pac. R. Co.* v. *Turner*, 141 Okl. 267, 284 Pac.

855; *Director-General of Railroads* v. *Bryant's Admr.*, 127 Va. 651, 105 S. E. 389; *Tackaberry Co.* v. *Simmons Warehouse Co.*, 170 Iowa, 203, 152 N. W. 779.)

The allegations of negligence relative to the angle of placement of the culvert with reference to the direct line of the current, and the evidence in support of the fact are important only so far as they concern the capacity of the culverts. These culverts and their predecessor of smaller capacity, so placed, had for twenty-three years demonstrated their sufficiency; and this being so, we cannot say that the angle of placement rendered them incapable of taking care of the usual and reasonably to be expected flow in Sand Ditch.

The record shows that these culverts were not reinforced with concrete collars but were imbedded without reinforcement in the sand fill. The defendant here was under no obligation to construct a dam to hold back the waters. On the contrary, the culverts were expected to carry all the water flowing to them, and it was not to be expected that water would be impounded. If the culverts were required to be so installed that they might serve as spillways, of course the grade through which they passed would demand a reinforced construction. Such, however, is not the purpose of culverts. The culverts being reasonably sufficient, the defendant was not bound to anticipate that water would be impounded by the fill, and hence it was not negligent in failing to so anticipate.

This case is decided by the application of the principles laid down in the *Heckaman Case,* supra. In each instance due consideration is given to the history of the stream, of the area drained, and of the openings of the embankments. In the *Heckaman Case* the application of the rules led to an affirmance of the judgment; the application of the same rules in these cases leads to a reversal of the judgments.

The question of proximate cause, and the questions relating to instructions, were presented and argued by counsel, but in view of our determination of the issue of negligence we deem it unnecessary to consider them.

The judgments are reversed and the causes remanded to the district court of Silver Bow county, with direction to dismiss the actions.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and ANDERSON concur.

Rehearing denied June 12, 1933.