[Civ. No. 5139. Second Appellate District, Division One.—April 5, 1928.]

HARRY E. MITCHELL, as Executor, etc., Respondent, **v.** DAVE H. GOULD, Appellant.

Bearman & Englehardt for Appellant.

Hazlett & Albee for Respondent.

WOOD (W. J.), J., *pro tem.*—This action was commenced by R. C. Mitchell to enforce the payment of five promissory notes executed by the defendant to plaintiff on March 3, 1921, each being in the sum of $500. After the trial of the action R. C. Mitchell died and Harry E. Mitchell was appointed executor of his estate and substituted as plaintiff herein. The notes were given as evidence of an indebtedness growing out of a transaction in which it is alleged that R. C. Mitchell earned a commission as broker in procuring a subtenant for defendant for a portion of the ground floor of the Brack Shops building in the city of Los Angeles, the defendant holding a lease upon said premises consisting of an unexpired term of fourteen years and five months. The written authorization under which the broker rendered services to defendant is in the following words: "For and in consideration of your services, I hereby appoint you my exclusive agent for a period of thirty days from the date hereof, to procure a tenant for the premises known as the California Store, ground floor Brack Shops building, approximately 35x108 feet, with basement and mezzanine, on the following terms and conditions: Lease to cover a period of seven years and —— months, commencing 30 days (thirty days) after signing of lease. The lease to include the use of the front as is, together with the fixtures as is installed throughout the store, and all other privileges enjoyed by me which are furnished by the owners of the property. The monthly rental shall be a flat rate of $2500 for the full term of the lease. Should you procure a tenant who accepts the premises herein described, in accordance with the foregoing terms and conditions, or any other terms

accepted by me, I hereby agree to pay you a commission at the regular rate authorized by the Los Angeles Realty Board, now in effect, said commission due and payable at the time of said acceptance, and authorize you to notify your client of my acceptance upon your receiving a written offer from him in conformity with the above. I agree to place with your firm any insurance carried on these premises during the life of this lease. I have read the foregoing and fully understand the terms and conditions.''

After making certain denials the defendant interposed what he denominates both a defense and a counterclaim. He alleges in substance that at the time he employed Mitchell to lease the premises and before a tenant was obtained, he stated to Mitchell that he did not want to make a lease for a longer period than seven years; that Mitchell did obtain a tenant, one Beckman, who was willing to lease the premises for a term of ten years and had actually made a deposit for such a lease, but that Mitchell advised the said Beckman that he could obtain a lease for 14 years and five months and thereupon, by reason of such advice from Mitchell, the said Beckman withdrew his offer and insisted upon a lease for the full term of defendant's lease, that is 14 years and five months; that defendant, at the time he executed the lease with Beckman, did not know that Beckman had been advised by Mitchell that the longer term lease was available. At the trial plaintiff offered the notes in evidence and rested. Thereupon the plaintiff objected to the introduction of any evidence in support of the defense above outlined on the ground that such matter did not constitute a valid defense. Although the court overruled the objection, a motion to strike out all of defendant's evidence was later granted. This ruling was erroneous.

Ben Beckman, the subtenant obtained by Mitchell, testified that he was willing to enter into a lease for 10 years, but that he learned in Mitchell's office that the lease could be obtained for approximately 15 years, whereupon he withdrew his offer to lease for 10 years. He had not learned anything about the 15 years' lease until his visit to Mitchell's office. The defendant testified that he informed Mitchell's representative that he "did not want to lease it for any long time" and that he "told him to rent it for a term of between five and seven years." He further testified: "And isn't it

true you told Mr. Bridwell, or whoever it was that brought that offer of Beckman's to you, that you would not rent for longer than nine years and five months? A. I told him after he said it would be hard to rent. He said, 'We can't rent it for any five or seven years, but we have got a tenant for around ten years,' and then I told him, 'All right,' that I was willing to go—'If you can't do anything else, I am willing to go for nine years and several months.' . . . Q. And then the lease was closed for fifteen years? A. No, not after a long while. I didn't care to go through for any such term. The proposition was made with Mr. Beckman for ten years, changed from seven to ten, and Mr. Beckman had executed a check with a signed letter accepting it for ten years at the rental at that time, when we were supposed to meet the next day to get together on the lease. The next day I had a telephone call from Mr. Mitchell's office that Mr. Beckman would not come through, would not take it for no ten years. He had withdrawn his first offer and he wanted the full term. Q. Continue with that conversation you had with Mr. Bridwell over the telephone. A. Mr. Bridwell said he was a desirable tenant and he said Mr. Beckman would not take it for no ten years, he wanted the full term, which I can't explain just the details of it, however, they got me to it, and I thought the best way out of it was to get rid of it, and I said all right, and I consented. . . . Q. And when the offer was brought to you, you accepted the offer, did you? A. I did, after it was explained there was no way out of it.'' The witness stated that he did not learn that Mitchell had informed Beckman of the possibility of obtaining the fifteen years' lease until after the lease had been executed and part of the commission paid. On cross-examination it was brought out that he was told in Beckman's office ''that Mitchell was the one that told him (Beckman) he could have the fifteen years and he had better stand pat on the fifteen years.''

 In support of the ruling of the trial court striking out the foregoing evidence, counsel for plaintiff argues that defendant was attempting to vary the terms of a written agreement, contrary to the provisions of section 1625, Civil Code. With this contention we cannot agree. Defendant agreed to pay the commission if a tenant should be found for a period of seven years or on ''any other terms accepted

by me." Both parties agree that a tenant was in fact found, on terms "accepted" by the defendant. The evidence introduced by defendant did not vary or attempt to vary any of the provisions of the agreement. Defendant did not attempt to prove that the contract was other than what it purported to be on its face, nor did he attempt to prove ‚that he had not agreed to pay the regular Los Angeles Realty Board commission if Mitchell obtained a tenant for a term longer than the seven years specified in the written listing.

██ It was the duty of Mitchell, as broker, to act in good faith and put forth his best efforts to further his principal's interests. If he failed in this regard he forfeited his right to a commission. ██ His instructions were to find a tenant for a short period, from five to seven years, and, in fact, he. did find one for ten years. The principal urged him to secure a short lease, but, according to the evidence stricken out, he informed the prospective tenant that a 15 years' lease could be obtained, whereupon the tenant refused to enter into a 10 years' lease. This testimony stood uncontradicted at the close of defendant's evidence, and, if true, established bad faith on the part of the broker. There is a very good reason for the rule requiring the exercise of good faith on the part of a broker in transactions of this kind. The principal engages a broker to secure a tenant on the best terms obtainable, in this case for a short period. He depends upon the efforts of the broker to secure a tenant. The opportunity might readily be presented to the broker to act in the interests of the tenant and against those of his principal. In the present case it was largely to the financial interest of the broker to make the longest lease possible, rather than the shortest, since his commission manifestly would be larger in amount in proportion to the length of the lease.

In *Harvey* v. *Lindsay,* 117 Mich. 267 [75 N. W. 627], the plaintiff was suing for a commission alleged to have been earned as a real estate broker. The following instruction of the trial court was approved: "If Mr. Gamble gave Mr. Leathers such information or made to him such statements as to cause Mr. Leathers to become satisfied that the defendants would not insist upon the price asked, and that he could press them into accepting a substantially less price

for the pine, Mr. Gamble was guilty of bad faith toward the defendant and his assignee, and the plaintiff, Mr. Harvey, would not be entitled to recover any compensation for what he may have done in connection with the deal with Mr. Leathers.'' In *Wiggins* v. *Wilson*, 55 Fla. 346 [45 South. 1011], the court says: ''If they knew or thought that this alleged customer of theirs had the ability and was ready and willing to purchase the property at the price and on the terms that they were authorized to sell it, it was their duty to promptly notify their principal of such fact. Then, after receiving such notice, if the principal sold to such customer at a less price and on different terms than those given to the plaintiffs, they would be entitled to their commissions. But if the plaintiffs knew of the customer's ability, readiness, and willingness to take the property at the price and on the terms named in their contract of employment, and withheld such knowledge from their principal, it amounted to bad faith with their principal, which forfeits their right to any commission out of a sale effected by the principal in ignorance of such facts.'' In *Alford* v. *Creagh*, 7 Ala. App. 358 [62 South. 254], the court lays down these rules: ''The law requires that a real estate agent, employed to sell land, must act in entire good faith and in the interest of his employer. *Henderson* v. *Vincent*, 84 Ala. 101 [4 South. 180]. To this end he must exact from the purchaser the price, the terms, and conditions of sale which his employer has fixed. 23 Am. & Eng. Ency. Law (2nd Ed.), p. 902. If he fails to do this, but induces the prospective purchaser to believe that the property can be bought for less, he fails to discharge that duty to his principal that good faith demands. Such conduct on the broker's part is well calculated to lead the purchaser to stand out and thereby either force from the seller a lower price than that fixed or delay the sale, even if he finally buys at the price fixed, both detrimental to the interest of the seller. . . . The real estate agent loses his right to commissions where, in his dealings in reference to the subject-matter of his employment, he is guilty of either fraud or bad faith towards his employer. 23 Am. & Eng. Ency. Law (2nd Ed.), p. 921.''

In his counterclaim defendant prayed for damages alleged to have been occasioned by Mitchell in advising Beckman to insist upon the longer lease and by his failure to close the

deal for the period of ten years. ▇ A broker who is employed to lease property upon the best terms possible, or for the shortest period obtainable, and who in bad faith and in the interest either of himself or anyone other than his principal, not only fails to bring about the execution of the lease on the terms which are available and which are most advantageous to his principal, but also advises the prospective lessee to insist upon a longer lease and one less advantageous to his principal, is liable to his principal for damages. In 9 Corpus Juris. 537, it is said: "If a broker employed to sell property understates to the principal the best price obtainable the principal may recover from him the difference between that obtained and that which might have been obtained." (*Brown* v. *Carpenter*, 142 Ky. 676 [134 S. W. 1150] ; *Holmes* v. *Cathcart*, 88 Minn. 213 [97 Am. St. Rep. 513, 60 L. R. A. 734, 92 N. W. 956] ; *Durand* v. *Preston*, 26 S. D. 222 [128 N. W. 129].)

▇ In support of his counterclaim counsel for defendant sought to establish by oral testimony the rental value of the leased property at the time of the trial. An objection to this testimony was made and sustained by the court. This ruling was correct. ▇ In such cases the measure of damages is the difference between the value of the lease actually obtained at the time of its execution and the value of the lease which would have been obtained had it not been for the wrongful conduct of the broker.

The judgment is reversed.

Conrey, P. J., and Houser, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 31, 1928.

All the Justices concurred.