CLAUDE O. HORTON, Plaintiff and Respondent,

v.

PAUL T. COLBRON, Defendant and Appellant, and MRS. PAUL T. COLBRON, Defendant.

(No. 2286; July 11, 1944; 150 P. 2d 315)

For the plaintiff and respondent the cause was submitted on the brief of W. A. Muir, of Rock Springs, Wyoming.

For the defendant and appellant the cause was submitted on the brief of Wilford W. Neilson, of Kemmerer, Wyoming and P. W. Spaulding, of Evanston, Wyoming.

## OPINION

BLUME, Justice.

This is a case brought by the plaintiff, Claude O. Horton, against Paul T. Colbron and Mrs. Paul T. Colbron, to recover a commission on account of acting as agent for the defendants in the sale of real estate situated in Teton County, Wyoming. The court rendered judgment in favor of the plaintiff against Paul T. Colbron for the amount claimed by him but dismissed the action as against Mrs. Paul T. Colbron. From the judgment so rendered the defendant, Paul T. Colbron, has appealed to this court. The plaintiff Horton will hereafter be referred to by name or as the plaintiff, and Paul T. Colbron will hereafter be referred to by name or as the appellant. The facts are substantially as follows:

On September 22, 1939, the defendant, Paul T. Colbron, was the owner of what is called in the record the Aspen ranch, consisting of 312 acres of land, situated in Teton County, Wyoming. Its value as a "dude" ranch, according to the witness, Felix Buchenroth, was $45,000, the witness stating that Colbron had that much money invested in the land. The plaintiff, Claude O. Horton, was at that time and during all the times herein mentioned a real estate broker, licensed under the laws of this State. A few days prior to September 22, 1939, the plaintiff visited the Aspen ranch for the purpose of having it listed with him as such broker and a few days thereafter a contract was entered

into between the plaintiff and Paul T. Colbron, as follows, to-wit:

"Sept. 22, 1939.

"In consideration of the services, during the term stated, of C. O. HORTON the undersigned hereby employs him as sole and exclusive agent for the sale or exchange of the property described as Aspen ranch, 312 acres on Snake River, for the term of............. days from date hereof, and agrees to pay said agent commission of Five per cent on the gross consideration of said sale or exchange, on the following terms:

"If, within 30 days after the expiration of said term, a sale or exchange is made to or with parties with whom said agent negotiated during said term and said agent shall have notified the undersigned, in writing, within 5 days after the end of said term, personally or by mail, of such negotiations the undersigned agrees to pay said agent the commission hereinabove provided.

(Sgd.) PAUL T. COLBRON,<br>Owner.

"In consideration of the foregoing employment the undersigned agent agrees to use diligence in procuring a purchaser.

(Sgd.) C. O. HORTON.

(Endorsement)

It is definitely understood that this listing is not binding excepting a buyer is produced by me.

(Sgd.) C. O. HORTON."

The contract was apparently signed by the plaintiff before he left the ranch, leaving it with Colbron's wife, and it apparently was subsequently signed by Paul T. Colbron when he sent it to the plaintiff in a letter which in part reads as follows: "I am very sorry

I was not at the ranch when you called a few days ago. I notice on the blank forms which you left for me to sign, and one of which I enclose herewith, that you desire to be employed as sole and exclusive agent. I hardly would care to do that, so have left that part blank. However, it will practically make no difference as far as you are concerned, for the place has not been listed with any other agent, and the chance of its being so listed is so small as to be negligible. Still, miracles *do* sometimes happen, and though the chance of a sale in the near future seems very improbable, it does exist. You will, of course, be fully protected if you produce a buyer, and the usual commission of 5% will be paid. * * * The price is $85,000." The contract thus entered into between the parties was in force and effect on May 29, 1941, as testified to both by the plaintiff and by the defendant Colbron.

Thereafter the plaintiff made what he calls "set-ups," consisting of pictures and the description of the ranch, took them with him to Los Angeles, California, where he had some business connections, and he mailed the set-ups or handed them personally to various persons and showed moving pictures thereof in California in addition to advertising them in the Los Angeles Examiner and the Los Angeles Times. He also took various parties, as the plaintiff testified, to or close up to the ranch, but on account of the price he could not interest anyone in the land. In the spring of 1940 the defendant Colbron reduced the price on the land to $70,000. During the fall plaintiff took one Chapen to the land. Colbron then reduced the land to the price of $60,000, but plaintiff could not interest Chapen in the land at that price. During the following winter plaintiff again showed the set-ups of the ranch in California by moving pictures either in the homes of parties or in the office of a business

connection which the plaintiff had at·that place. About May 24, 1941, one C. C. Moseley, sole owner by himself and family of the Aircraft Industries Corporationed, appeared in Jackson, Wyoming, and called on tioned, apeared in Jackson, Wyoming, and called on one Lewis G. Gill, owner of the Log Cabin Saloon at Jackson, Wyoming, having been recommended to see Gill upon his arrival at Jackson. He was interested at that time, as he testified, in buying a small and inexpensive ranch for approximately $8,000 or $10,000. Gill introduced Moseley to the plaintiff Horton. For the four or five following days, according to the testimony, the plaintiff took Moseley to various places around Jackson, and on the 28th day of May, showed. him the socalled McCormick ranch which Horton, as real estate bròker, had for sale at the sum of $15,000 and which contained 319 acres. Moseley became interested in that ranch, but on return to Jackson it was found that the place had been sold.

The testimony of the plaintiff Horton, aside from facts already mentioned and leaving out matters of secondary importance, is in substance as follows: During the time that he was taking Moseley around the country, he mentioned, among other ranches, that he had the so-called Aspen ranch for sale. He had a talk with Mr. Moseley on the evening of May 28, or the morning of May 29, 1941, about going over to the Aspen ranch on the latter date. He told Moseley that he would go to the ranch and try to get the price down which at that time was $60,000. On the morning of the latter date he went over to the Aspen ranch, told Mr. and Mrs. Colbron that he had a very good cash prospect for a good ranch and that he thought that they had an excellent chance of selling it if the Colbrons would get the price down to where it belonged, somewhere around $50,000. He told them that he had shown

the McCormick ranch to the client on the day before, and that that ranch was about what Moseley wanted, but that he didn't know whether or not the latter would go as far as paying $60,000 for a ranch. "Q. Did you tell Mr. Colbron who your client was?, A. I did, Sir. Q. Did you tell him who he was and all about him? A. I told him it was Major C. C. Moseley, who at that time was president of the Grand Central Air Terminal at Glendale, California." Colbron thereupon stated, "Mr. Horton, we are very anxious to sell and be sure and bring that client over. We will cut the price to $50,000.00 and don't let him get away because we really need to sell and don't overlook it." Plaintiff thereupon made a definite appointment to take Moseley over to the Aspen ranch that afternoon at 2:30. He returned to Jackson about noon. He met Moseley in front of the Log Cabin Saloon and told him that he had made an appointment at 2:30 that afternoon for Moseley to see the Aspen ranch. The latter asked plaintiff to have lunch with him in the Bluebird Cafe and tell him all about the matter. Plaintiff, however, wanted to find out whether or not he had some telegrams in regard to some other ranches which he might sell to Moseley, and he did not see the latter again during that day. He saw Lew Gill after he returned from the Aspen ranch and had a conversation with him. When he was asked about the conversation an objection was made and the objection was sustained. He was then asked, "Why was it you didn't go with Mr. Moseley and Mr. Gill and Mr. Buchenroth to the Aspen Ranch that afternoon? A. Because Mr. Gill told me had had been down to the bank—" An objection then made to this testimoney was sustained. He was asked again, "Now, why was it you didn't go and take Mr. Moseley to the Colbron ranch that afternoon? Don't testify to what anybody told you, just

say why it was you didn't go. A. Because Mr. Gill and Mr. Buchenroth took him over. Q. Did you know that? A. I knew it. Q. And at what time of the day did you get that information? A. In the afternoon, after lunch. It was approximately 1:00 o'clock that I knew they were going over. Q. Now, at that time was Mr. Gill assisting you and working with you and co-operating with you for the purpose of selling this ranch of Mr. Colbron's to Mr. Moseley? A. He was, Sir." He advised Gill, after returning from the Aspen ranch, that Colbron had reduced the price of the ranch to $50,000.

Lewis G. Gill, above mentioned, was a witness in the case. He testified that he was helping the plaintiff Horton in selling the Aspen ranch. He saw Mr. Moseley and Mr. Horton on the night of the 28th at his place; that they then discussed the Aspen ranch and other ranches; that the witness asked Horton if he had the Aspen ranch for sale and that Horton stated that he had and the witness asked, "Why don't you show Mr. Moseley that?" And the plaintiff Horton answered, that he would go over the next morning and make an appointment for Moseley to see the ranch; that Horton went over to the ranch the next day and saw the witness upon his return and told him that the ranch could be bought for $50,000 or less. The witness conveyed that information to Moseley. Moseley stated, "I think it is too much money. I don't want to put in that much money." The witness said, "It won't cost anything to go look at it," and Moseley stated, "All right, I will go look at it." That morning the witness went over to the Jackson Bank, of which Mr. Buchenroth is president, and discussed the sale of the ranch with Buchenroth. The latter called up Mr. Colbron and the witness and Mr. Buchenroth, in the former's car, took Mr. and Mrs. Moseley to see

the Aspen ranch that afternoon. Asked why Horton didn't go along, he answered, "I guess he wasn't invited. None of them suggested him going out." Before going out, Horton had told him and Mr. Moseley that he had an engagement to take Mr. Moseley over to the Aspen ranch that afternoon. The witness went out to the Aspen ranch as a go-between to help Horton in selling the Aspen ranch and to get Mr. Moseley settled in that country. Upon their return to Jackson in the evening, he told Horton that Mr. Moseley liked the place very much, that he thought he might buy it, but no agreement had been reached between the parties at that time. Later, about 8:00 o'clock that evening, Mr. Moseley came to him at his Club, asked him to get Mr. Buchenroth over there and Mr. Buchenroth thereupon phoned the Colbrons, who came in about 9:00 o'clock that evening and the sale of the ranch was finally consummated at the price of $45,-000. The witness went out to find Mr. Horton but was unable to do so.

Mr. Buchenroth, above mentioned, was a witness for defendants in the case. He testified: "Mr. Lew Gill came to the bank and asked me whether I knew any ranches for sale. He explained he had a friend who was looking for a place; that Mr. Horton had taken the man out and showed him places but couldn't show him one that suited. I told him I knew of three places and I mentioned one of them was the Aspen ranch, and Mr. Gill said that the price was too high, that Mr. Moseley expected to spend between $20,000 and $30,000. I didn't think that the Aspen ranch could be bought for that. As a matter of fact, I knew it couldn't, but since there were two more places, I called Mr. Colbron up and asked him whether I could bring a man over there to see the place. I didn't mention any name, nor did I know Mr. Moseley before that

time. I made a date in the afternoon with Mr. Colbron to take Mr. Moseley over there after the bank closed. About 2:30 Mr. Gill, Mr. Moseley and Mrs. Moseley came to the bank and I went with them over to the Aspen ranch. We met Mr. Colbron there and showed him (Moseley) the place. Mr. Moseley went all over the place and asked Mr. Colbron the price. Mr. Colbron stated $55,000.00. Mr. Moseley offered $35,-000.00. We talked for awhile there but since they were too far apart, nothing further was said and we went home. * * * Q. It was because Mr. Gill came to your bank that you called Mr. Colbron on the 'phone? A. Absolutely." Later, that evening, when he saw the parties in the Log Cabin Saloon, Mr. Moseley didn't want to go over $35,000 and Mr. Colbron didn't want to come down, finally Mr. Mosely offered $40,000 and Mr. Colbron came down to $50,000. That was around midnight, so the witness asked whether they wouldn't split the difference and get together at $45,000 which they finally did. In the meantime he had mentioned that no real estate agent was involved in the case, but Lewis G. Gill, who was present, stated that there might be an agent, namely Mr. Horton. Witness then asked Gill to call up Mr. Horton on the 'phone which he did, but didn't get him, and he thereafter sent Gill out to hunt Horton, but Gill couldn't find him and the deal was closed with the understanding on the part of Colbron that he was not to pay any commission. Paul Colbron stated that no real estate commission was involved and he asked Moseley if Horton had shown him the place and the answer was no.

The defendant, Paul T. Colbron, admitted in his testimony that the place was listed for sale with Horton and that the contract entered into by them was still in force and effect. He also admitted that the plaintiff was over at his place on the morning of May 29,

1941. He did not remember that he reduced the price of the farm to $50,000, but did remember that he would be glad to bargain with a client brought by him. "Q. What remarks, if any, did he (plaintiff) make? A. He remarked that he had a client for a cattle ranch in the valley whom he had been taking around the day before and he expressed much disappointment at failing to sell him a ranch on the other side of the river. He did not mention the client's name. Q. Did you make inquiry of Mr. Horton as to whether or not his client would be interested in purchasing your property? A. Not exactly but I urged him to bring the client to see the Aspen ranch even though it was not a cattle ranch. Q. What reply did Mr. Horton make to your inquiry about his bringing the client to the Aspen ranch? A. Mr. Horton replied that he thought it would be useless. Q. Why? A. Mr. Horton said that in the first place the Aspen ranch was not a cattle ranch and the client desired one, and in the second place the price I had quoted was so very much above the price the client desired to pay that it would be a waste of time to bring him. Q. State whether or not he finally agreed to bring this client. A. After repeated urging on my part he reluctantly agreed to do so." The witness later, during the afternoon or eevning of that day, found out the client's name, namely Mr. C. C. Moseley. Mr. Buchenroth phoned while he was talking to plaintiff. Mr. and Mrs. Moseley and Mr. Buchenroth came out to his place in the afternoon of the date last mentioned in Mr. Gill's car. The witness also testified to the sale as subsequently made. He asked Moseley if plaintiff was concerned in the deal, and Moseley replied that he was not, and that plaintiff had never mentioned the Aspen ranch to him. He sold the place for a smaller sum than that quoted to plaintiff partly because no commission was involved.

The witness C. C. Moseley, purchaser of the land, testified that the plaintiff Horton never mentioned the Aspen ranch to him and that he thought that Mr. Gill and Mr. Horton were acting independently, that he never heard of the Aspen ranch, until Gill told him that Buchenroth had said it was for sale, and that Gill suggested that he, the witness, should go to see the ranch, after he had talked with Buchenroth; that Colbron told him he had listed the ranch with plaintiff a long time ago, but that he would not pay him a commission, since plaintiff had nothing to do with selling the ranch.

I. Appellant contends that Mr. Buchenroth, and not the planitiff, produced the purchaser for his ranch, and was the procuring cause of the sale. The testimony is to some extent conflicting. The brief filed on behalf of the appellant is, in a number of important points, based on the theory that the testimony in his behalf is true. But that is contrary to the rules of appellate procedure. To determine the credibility of witnesses was within the province of the trial court, and we must give the evidence on behalf of the plaintiff, the successful party herein, every favorable inference which may reasonably and fairly be drawn therefrom. Willis v. Willis, 48 Wyo. 403, 429, 49 P. 2d 670. Applying that rule, we are not persuaded that we would be justified in reversing the trial court's finding herein. The testimony is uncontradicted that the Aspen ranch was listed with the plaintiff for sale, by the appellant, and that under their agreement the latter would pay a commission of five per cent on the gross amount of the sale. The contract, as construed by both parties, was that plaintiff should produce a purchaser for the ranch. Plaintiff made various efforts to sell the ranch, but was unsuccessful mainly because of the high price of the land, set by appellant. Moseley

was plaintiff's customer to whom he showed various ranches on the days preceding May 29, 1941, when the sale of the Aspen ranch was made to the latter. On May 29, 1941, plaintiff saw the appellant at the latter's ranch, discussed the sale thereof with him, and told him that he had a customer who was looking for a ranch. It was agreed between the plaintiff and the appellant that the former should bring his customer to the Aspen ranch for the purpose of bargaining with him for the sale thereof. The plaintiff's testimony further shows that Gill, who was working and collaborating with the plaintiff, took Mr. Moseley, accompanied by Mr. Buchenroth, out to the ranch on that day, and as a result thereof a sale was effected subsequently on that day for the sum of $45,000. Not alone was appellant informed by plaintiff that Moseley was his customer, but Moseley also knew that plaintiff had the property listed with him for sale. If the fact that Mr. Moseley thought that Gill and the plaintiff were acting separately is of any importance, which is doubtful, the court was not compelled to believe the testimony on that point. Moseley knew that Horton was a real estate broker; that Gill was not. The latter had worked with and through the plaintiff during the preceding days. Mr. Buchenroth testified that he would not have called up the appellant (or hence would not have accompanied Gill to the ranch) had it not been for the fact that Gill came to him on the morning of May 29, 1941, and talked with him. Mr. Buchenroth assisted in making the sale. But that is a matter different from that of producing a purchaser, and we cannot say that there is not substantial testimony from which the trial court could find that plaintiff, with Gill's assistance, produced the purchaser. We are cited to authorities which deal with a situation in which the agent had not in-

formed the owner that he was dealing with a particular customer, and that the purchaser was the party found by the agent. But these authorities are hardly applicable in the case at bar. Plaintiff testified that he fully informed the appellant that Moseley was his customer, and that he intended to bring him to appellant's place. He did not himself do so, but the person working with him did. Furthermore, appellant himself testified that he found out in the afternoon or the evening of May 29 that Moseley was plaintiff's customer, and that the latter was, accordingly, the party mentioned by plaintiff to appellant on that day. Again, he received definite informatoin that evening from Gill that plaintiff might claim a commisson, but despite that fact, he took his chances, and closed the deal. And he also received definite information from plaintiff himself that the latter was claiming a commission some 14 or 15 days before the transaction was finally culminated on June 18, 1941, when the deed to the property was made. We are also cited to authorities which deal with concealment of material facts from the owner by the agent, but in view of the facts herein, outlined above, we hardly think that these authorities are applicable herein. It would seem that the appellant knew or should have known all the material facts. True, the record shows that Moseley assured the appellant that the plaintiff had nothing to do with the transaction. But Moseley's statement could not bind the defendant, and he had no right to rely thereon, particularly in view of the facts above set out. 12 C.J.S. 218. Accordingly, under the testimony in favor of plaintiff, if true, appellant is hardly in position to claim that he was ignorant of the fact that Moseley was the purchaser found by the plaintiff. It is argued in appellant's brief that Gill consented to the sale, made upon condition that no commission

was to be paid, and that such consent was binding on plaintiff. Gill was present at the time when the sale was effected; but there is no evidence that he consented to the condition mentioned. In fact the contrary seems to appear, since Gill mentioned that plaintiff might claim a commission. It is intimated in the brief of appellant that plaintiff arranged with Gill to take Moseley out, and "set back out of sight, until the deal was closed, and then claim a commission." Plaintiff could not be found that evening when Gill telephoned to his house, and when Gill went out to find him. There is no evidence in the record to show that plaintiff hid out purposely. The meeting of appellant and Moseley at which the sale was made, took place at nine o'clock at night, was brought about by Moseley unexpectedly, and could hardly have been anticipated by anyone else. The fact that plaintiff was not present at the time of making the sale was not a sufficient reason for refusal to pay a commission. Foley v. Hassey, 55 Wyo. 24, 95 P. 2d 85.

II. It is argued on behalf of the appellant that plaintiff did not act in good faith, and that he and Gill were working for Moseley rather than appellant. Great stress is laid upon the fact that Gill told Moseley, as testified to by Gill, that the Aspen ranch could be bought for $50,000 *or less*. It is contended that by reason of this statement plaintiff is not entitled to a commission. We are cited, as authority therefor, to Alford v. Creagh, 7 Ala. App. 358, 62 So. 54, and Mitchell v. Gould, 90 Cal. App. 647, 266 P. 566. In the Alabama case the agent told the prospective purchaser that the property, for sale at $12,000, could be bought for $10,000. In the California case, the owner of the property wanted to lease his property for seven years; a customer appeared who was willing to lease it for ten years; the owner's agent told the customer that

he could get a lease for 14 years, and such lease was finally entered into. In the case at bar the statement was the indefinite statement that the property could be bought for $50,000 or less. The amount might be one dollar less. We have no fault to find with the conclusions reached by the Alabama and California courts in the cases above mentioned. But to lay down a general rule that in all cases where an indefinite statement is made such as appears in the case at bar, the agent forfeits his commission, is, we think, unwarranted. The ultimate criterion, as correctly stated by counsel for the appellant, and as shown by the numerous authorities cited by him, is whether or not the agent acted in good faith and for the best interests of the principal. In the case at bar, appellant testified that he was anxious to sell, and he urged plaintiff to bring Moseley, and that he would bargain with him, regardless of the price which he had previously set. Moseley was at Jackson to buy a place costing from $8,000 to $10,000. He finally agreed to pay as much as $15,000. He told Gill that it was no use for him to go and see the Aspen ranch, because he did not want to invest as much as appellant asked. The main point then, apparently, was to get Moseley to go and see the ranch at all. And the trial court may well have concluded that the statement made by Gill was made for that purpose. We cannot, we think, under the circumstances reverse the trial court in finding against the appellant on the points here under discussion. It has not been pointed out what more under the circumstances, could have been done for the interests of the appellant. The trial court probably concluded, and we are not able to say incorrectly, that had it not been for the very acts which were performed by the plaintiff and Gill, appellant might still have his ranch unsold. We might incidentally mention the fact that if

Moseley's testimony were accepted as true, it is altogether clear that the statement of Gill above mentioned did not have the slightest influence upon the former.

III.  It is argued that there is no evidence that plaintiff used diligence, and he pleaded that plaintiff did not procure a purchaser within a reasonable time after entering into the written contract heretofore mentioned. The terms diligence and reasonable time are relative terms. What might be want of diligence and unreasonable time in one case might not be in another. Paul T. Colbron himself testified that the contract entered into in September, 1939, was still in effect on the day when the sale to Moseley was made. The question of diligence and reasonable time were, it would seem, thereby eliminated from the case

IV.  Licenses as real estate broker were issued during 1939-1942 to Claude O. Horton, and introduced in evidence. Counsel for appellant claim that the record does not show that the plaintiff in this case is the same person to whom these licenses were issued. Plaintiff, whose name is Claude O. Horton, testified that he was a licensed real estate agent or broker in Wyoming during 1939 to 1942, both inclusive, and while he was on the witness stand, he identified the licenses above mentioned, and they were introduced in evidence. Being in his possession, we think the inference was permissible that he was the licensee therein mentioned.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

*Affirmed.*

KIMBALL, C. J., AND RINER, J., concur.