MARGUERITE A. JACOBY,

*Plaintiff and Appellant,*

vs.

THE TOWN OF THE CITY OF GILLETTE, WYO-
MING, a Municipal Corporation,

*Defendant and Respondent.*

T. C. WASSENBERG,

*Plaintiff and Appellant,*

vs.

THE TOWN OF THE CITY OF GILLETTE, WYO-
MING, a Municipal Corporation,

*Defendant and Respondent.*

(Nos. 2336 and 2337; November 26th, 1946; 174 Pac. 2d 505)

488

For the plaintiffs and appellants the cause was submitted on the brief of E. C. Raymond of Newcastle, Wyoming and R. G. Diefenderfer of Sheridan, Wyoming.

For the defendants and respondents the cause was submitted on the brief of Earl Dunlap and Elwood Anderson, both of Gillette, Wyoming.

490

## OPINION

RINER, Justice.

These two cases come here by direct appeal proceedings from the District Court of Campbell County upon one record, having been tried together to the court without a jury. All the litigants through their respective counsel have stipulated that the causes should be consolidated in this court for all purposes including abstracting, briefing, argument and determination. An appropriate order has been entered here agreeable to this stipulation.

As regards the matter of liability of the respondent, The Town of the City of Gillette, both cases rest upon the same facts. The specification of errors in each is the same, consisting of but two assignments which may be summed up in the simple claim by the appellants that the judgments are not supported by the evidence and hence are contrary to law. One opinion will suffice, therefore, to dispose of both cases.

As may be inferred from what has already been said, the trial resulted in judgments rendered in favor of the Town of the City of Gillette which will usually hereinafter be mentioned as the "City", it being the defendant in each case in the District Court. The appellants, Marguerite A. Jacoby, plaintiff in one case, and T. C. Wassenberg, plaintiff in the other, may be referred to for convenience and brevity as the "plaintiffs". Wherever necessary, their respective surnames will be used. The judgments in question were similar, the court, finding generally for the defendant and against the plaintiffs and ordering that the petition in each case be dismissed. Both actions were brought against the City to recover for damage caused plaintiffs on account

of the over-flow of a certain ditch or canal constructed to carry off drainage waters from sundry lands located without the corporate limits of the municipality above named, but which passed through them. A more particular description of this ditch or canal will be given hereinafter. In plaintiffs' petitions it was charged in paragraphs numbered "6" that:

"the defendant, having the sole control and ownership of said ditch, owed to the plaintiff the duty of keeping and maintaining the said ditch in a condition that would permit the free and unobstructed passage of all water running through it within the corporate limits of said defendant, and carry all of said water safely in said ditch without overflowing or escaping therefrom,"

and in paragraph numbered "7" that:

"the defendant, wholly unmindful of its said duty and in utter disregard thereof, negligently and carelessly maintained its said ditch and permitted it to be or become in such condition that it failed to carry the said water without escaping therefrom and entering and flowing upon the premises of this plaintiff."

Defendant's answers denied that "the Defendant's negligence in any way caused the flood or contributed to the alleged damages" to the plaintiffs as set forth in their petitions. These answers also alleged:

"That the rain, snow or flood that occurred on or about the 22nd day of January, 1943, was an unprecedented amount that could not be anticipated and came in such quantities as to be an act of God."

The foregoing excerpts from the pleadings of the parties will, we think, supply a reasonably accurate concept of the issues to be determined on the facts appearing in the record before us.

Where the assignments of error were similar to those described above, this court in Willis vs. Willis, 48 Wyo. 403, 429, 49 Pac. (2d) 670, said that:

"In this connection it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it."

This rule has been frequently referred to and applied in subsequent decisions here; see Northwest States Utilities Co. vs. Brouillette 51 Wyo. 132, 65 Pac. (2d) 223; Branson vs. Roelofsz 52 Wyo. 101, 70 Pac. (2d) 589; Horton vs. Colbron 60 Wyo. 263, 150 Pac. (2d), 315; Havens vs. Irvine, 61 Wyo. 309, 157 Pac. (2d) 570.

With this rule in mind we shall briefly review the substance of the evidence in this record.

During the year 1908 the Chicago, Burlington & Quincy Railroad Co. constructed a ditch or canal for the disposition of waters that were diverted by a dam located about 4½ miles southwest of the City. This ditch commences at this dam, pursues a northeasterly course until it reaches a point where the grade of the land permits a change of direction and from there it follows a northwesterly course through the City, thence adopts a course almost east and finally ends in a natural reservoir site located about a mile north of the City. The length of the ditch from its head to the corporate limits of the City is between four and five miles. There is a concrete flood gate about a half mile east of the dam which was constructed as a flood control device. This device has concrete side walls with a steel flood gate which is controlled by wheels, is set in the side of the ditch bank on the down-stream side and must be opened by hand.

On Oct. 22, 1942 the City purchased from the Railroad Company aforesaid that portion of this ditch situated within the corporate limits of said city but so far as appears by the record herein, outside those limits

the corporate authorities had no legal control of it. Within the corporate limits of the City, the land sloped from the south to the north and in consequence, the north bank of the ditch was apparently lower than the south bank. The water has flowed in this ditch "in fine shape" as one witness testified, and carried the flow satisfactorily since its construction in 1908 until Jan. 22, 1943, a period of approximately thirty-five years. The only exceptions when overflows from the ditch have occurred have been due to ice jams. These ice jams were caused by small flows of water from thawing snow which would freeze. Thereafter another thaw would set in, water would again come into the ditch raising the ice and "some of the chunks of ice would get crosswise in the ditch" pile up and produce "a sort of dam in the ditch and cause it to overflow". The City has caused the removal of ashes and ten cans thrown into the canal by residents living in that vicinity as also it has removed weeds which grew therein so that there were no appreciable obstructions to the flow of water as it came down the ditch on January 22, 1943 as hereinafter described.

For a day at least prior to and also on the date last mentioned, a very warm wind, known as a "chinook", prevailed in the City and especially in the water-shed to the southwest, south and southeasterly directions therefrom, though there was testimony that when it was thawing in the City with water running from the melting snow "out north a mile or so it was below zero". It appears also that prior to the date aforesaid a great deal of snow had fallen in the city—"we had from ten to twelve inches of snow that morning" as one witness testified—and adjoining territory. The result of this unusually heavy thawing weather and the large amount of snow prevalent, as above stated, was that a great flood of water came down the canal in a very few hours' time. In fact nothing like its volume had

been known by long time residents in the vicinity for some thirty-five years. Yet during the forenoon of January 22, 1943 there was practically no water in the ditch. By 1:00 o'clock P. M. it was commencing to flow a little. At 5:30 P. M. of that day the water flow half filled the ditch. A witness surveyor with engineering training of some eleven years, testifying for plaintiffs, stated that he saw this water in the ditch about that time but observed nothing along it in looking at it then that excited any fear on his part of anything happening to the ditch. At 10:30 P. M. the water was running over at two low places in the bank on the north side of the ditch. This overflowing water had a depth of three or four inches at the lowest point on this bank with a width of less than twenty-five feet. Here the canal was fifty-four feet wide with a ten foot wide bottom and five and two tenths feet deep. These overflows were the cause of the damage to plaintiff's premises and for which the City is sought to be held liable.

A licensed engineer licensed by the State of Wyoming who had served as County Surveyor of Campbell County for some twenty years with interruptions during the war testified for the City that he had been familiar with the ditch in question since it was built in 1908, his father having constructed the concrete spillways in the ditch and this witness as a boy had assisted in this work. He also testified that:

"The most unusual phase of it was, the bulk of the water was coming into the ditch between the upper spillway and Gillette; whereas, ordinarily, you can regulate the flow coming out of Donkey Creek, and that would regulate it all the way through town. But this unusual circumstance showed that we had no way of controlling it at the upper reaches, because of the volume of water that came in from the lower water shed. The ground was frozen. The snow started to move all at once, and a large measure of the water that accumulated in the ditch by the time it reached Gillette was in

the water shed between here and the upper controls."

Also that as far as his observations went while he had seen a lot of floods go down the ditch, this one was the largest one he saw and the only time he ever observed it overflow except when that was caused by an ice jam; that the ditch was carrying at least nine tenths of the water flow that flowed in the area above it in the city limits. This witness also said that he was familiar during the three months period between October 1942 and January 1943 with the top of the ditch bank on the north side thereof, it having been used as a foot path, beaten down hard, for years; that there was no unusual depression in this ditch bank in "that it runs rather uniform through its length". On cross examination the same witness stated that this flood was unprecedented and that "we had no occasion to anticipate anythink like that" and that this was "the biggest volume it flowed since 1908". The following questions and answers were also propounded to and given by this witness on his re-direct examination to-wit:

"Q. Mr. Spellman, you testified according to this map here something about there being a raise of 10 inches in the bottom of the ditch; where?

A. Right where the gutters come into it, on Main street there. It caused a raise of debris and shale and stuff that was in the ditch at those points.

Q. Was that ten inches there before or after January 22nd?

A. That was after, because I went up, sounded the depth of the water after the flow was there.

Q. Then that wasn't the condition of the ditch when the flood took place?

A. No.

Q. And those dams or raises or humps were caused by that same flood carrying in shale and dirt that washed off of the streets south and above the ditch?

A.   I wouldn't say all of it was caused by that, but a large part of it was.

Q.   A great deal of the ten inches?

A.   I would imagine a big part of it was."

Both the witnesses above mentioned, having had training in surveying, agreed that at the peak of the flood there was more water coming down the ditch than it could hold, the witness for the plaintiffs answering these questions put on cross examination by counsel for the City and also by the trial judge thus:

"Q.   In other words, there was more water coming down than that ditch was capable of handling at that time?

A.   I think so.

THE COURT:   I understand your answer now to be, if those low places "A" and "B" were up equal to the rest of the bank it would have been practically the same elevation all along there as the balance of the great majority of the bank, that even then the ditch would not have held the water anyhow?

A.   Well, I doubt it.

Q.   It is your opinion it would not?

A.   No, I don't think it would."

There is other testimony in the record on behalf of the City confirming what has been above given as to the condition of the ditch relative to obstructions therein, the unusual volume of the flood waters in the ditch and surrounding territory.

When the city officials were notified about 10:00 P. M. of the night of January 22, 1943 concerning the serious nature of the flow in the ditch with its consequent overflow, they appear to have acted with commendable promptness to do what they could to alleviate the situation. They immediately hastened to the flood gate control—though it will be recalled that this was

far without the corporate limits of the City and not under its supervision—and got it "wide open"; they also used dynamite to break open a bank of the ditch; and this too was done without the corporate limits of the City where it had no jurisdiction, and southeastwardly therefrom, in an endeavor to relieve the volume of water flow. They subsequently pumped most of the water out of plaintiffs' property into which it had flowed and caused the damage of which complaint is made.

It should be additionaly noted that the trial judge at the request of the litigants and accompanied by counsel for all parties visited and inspected "the premises in question in this litigation."

As we have seen, the negligence charged against the City by plaintiffs in their petitions appears to be (1) that the ditch was obstructed by the City's failure to keep and maintain it in a condition that would permit the free and unobstructed passage of all the water running through it within the city limits and (2) a failure to keep and maintain the ditch so that it would "carry all said water safely in said ditch without overflowing or escaping therefrom".

The first charge thus made would appear to be a pure question of fact. This question the trial court resolved against the plaintiffs and there was, as we think, and as is disclosed by the review of the testimony hereinbefore set forth, substantial evidence in the record to support such a finding. While there was some little conflict in the evidence on the point the trial court seeing and hearing the witnesses who testified concerning the matter was authorized to resolve the conflict in favor of the City. Under the rule in the Willis case supra, we hardly see how we can interfere with its finding in this respect. The second charge of negligence made as above stated would appear to be a mixed question of law and fact, the legal query being whether

the City was bound at its peril to so maintain the canal as to carry all of the water flowing in it safely without overflowing i. e., that the City was an insurer against the overflow of the water carried. Concerning that question we accordingly examine authorities bearing on the point.

The early leading English case of Rylands vs. Fletcher (1866) L. R. 1 Ex. 265 was one where the defendants constructed a reservoir on land separated from the plaintiff's colliery by intervening land. Mines under both the reservoir site and the intervening land had previously been worked. The plaintiff by workings legally made in his own property and the intervening land, had opened an underground communication between his colliery and these old workings. Neither the defendants nor any of their employees who had constructed the reservoir knew that such communications existed or even that these old workings existed under the reservoir site and the defendants were not personally guilty of any negligence. As a matter of fact there were five old shafts under the reservoir which shafts led down into the workings. When the reservoir was undertaken to be filled, the water broke through into these shafts and so poured on into plaintiff's mines. The English Court of Exchequer held the defendants liable for the resultant damage. This judgment was affirmed on appeal to the House of Lords (1868) L. R. 3 H. L. 330. The rule in the case just mentioned as announced by Blackburn, J. at p. 279 of L. R. 1 Ex. 265 supra is that:

"The person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape."

But that great judge also said in the sentence immedi-

ately following the excerpt above given: "He can excuse himself by showing that the escape was owing to the plaintiff's default; or perhaps that the escape was the consequence of *vis major* or the act of God."

This dictum of the learned judge was transmuted into law by the decision in Nichols vs. Marsland L. R. 10 Ex. 255 and the rule established that the decision in the Rylands case aforesaid was inapplicable where the injury is caused by *"vis major"* or the "act of God" which are generally regarded as interchangeable terms. In that case the defendant was the owner of certain artificial pools formed by damming a natural stream into which the water was finally allowed to escape by means of a system of weirs. The rainfall accompanying an extremely violent thunder storm through accumulated pressure broke the embankments and the rush of water down the stream carried away four bridges on plaintiff's adjoining property in respect of which damage the action was brought. There was no negligence in the construction of these weirs or dams. The jury having found that there was no negligence and that the damage could not have been reasonably anticipated, the court held that the damage sued for was caused by an "act of God" excusing the defendant from liability.

A case decided subsequently to that last cited and which would also appear to be of some considerable aid in resolving the cases at bar—these appearing to be even stronger than it as we see them—is that of Nitro-Phosphate etc. Chemical Manure Co. vs. London and St. Katharine Docks Co., 9 Ch. Div. 503 at 515-516 where the defedants were sued for damage done by an unusually high tide owing to the retaining bank crown at their docks on the Thames River not being sufficiently high—being for some distance from six to ten inches below the height of four feet as the adjoining dock

banks were constructed. The defendant's docks and the bank were established in the year 1855. From that year until March, 1874 no water had ever passed over the bank in question. In the year last mentioned, however, a tide did come which overflowed the defendant's bank but did damage of little consequence.

Mr. Justice Fry in considering the defendant's common-law liability said:

"it is said that, after the tide had once reached four feet, a tide which reached that height again could never be said to be so unusual or unexpected as to be deemed an act of God in the legal sense of the words. I do not think that the mere fact that a phenomenon has happened once, when it does not carry with it or import any probability of a recurrence—when, in other words, it does not imply any law from which its recurrence can be inferred—places that phenomenon out of the operation of the rule of law with regard to the act of God. In order that the phenomenon should fall within that rule it is not, in my opinion, necessary that it should be unique, that it should happen for the first time; it is enough that it is extraordinary, and such as could not reasonably be anticipated. That appears to me to be the view which has been taken in all the cases, and notably by Lord Justice Mellish in the recent case of Nichols vs. Marsland. He says, speaking of the flood which had occurred there, 'The jury have distinctly found, not only that there was no negligence in the construction or the maintenance of the reservoirs, but that the flood was so great that it could not reasonably have been anticipated, although, if it had been anticipated, the effect might have been prevented; and this seems to us in substance a finding that the escape of the water was owing to the act of God.' Pausing there, it may be observed, that to say that a thing could not reasonably have been anticipated is to say that it is the act of God."

In Pollock on Torts (14th Ed.) 393 it is said:

"the rule in Rylands v. Fletcher has been decided by the Court of Appeal not to apply to damage of which the immediate cause is the act of God. And the act of

God does not necessarily mean an operation of natural forces so violent and unexpected that no human foresight· or skill could possibly have prevented its effects. It is enough that the accident should be such as human foresight could not be reasonably expected to anticipate; *and whether it comes within this description is a question of fact."* (Italics supplied)

and the, Nichols vs. Marsland case aforesaid is cited.

The author of a monograph in 1 Can. Bar Review 140-147, 57 Am. L. Rev. 549 concerning the rule in Rylands vs. Fletcher supra and its limitations says that:

"The 'act of God' which excludes the operation of the Rule in question means *any extraordinary occurrence or act which could not reasonably be anticipated or prevented by reasonable care,* and it may be one which it is either physically or practically impossible to guard against.

'To come within the Rule of vis major it is not necessary that the act should be unique, that it should happen for the first time; it is enough that it is extraordinary and such as could not reasonably have been anticipated'."

Citing Watt & Scott, Limited v. City of Montreal, 60 Can. S. C. R. 523; 69 D. L. R. 1; Nichols v. Marsland, L. R. 10 Ex. 255; Valiquette v. Fraser, 39 Can. S. C. R. 1; Nashwaak Pulp Co. v. Wade (1918), 43 D. L. R. 143 (New Brunswick, C. A.); Greenock Corporation v. Caledonian Ry. (1917) A. C. 556; Nitro-Phosphate Co. v. London & St. Katharine Docks Co., 9 Ch. D. at p. 515. In addition to the limitation upon the rule in the Rylands vs. Fletcher case which was clearly established by the Marsland case decision above reviewed a number of other limitations have been subsequently imposed by the English Courts upon that rule as is accurately pointed out by the author of the aforesaid monograph.

Turning now to the American authorities, we find that the Commission of Appeals of New York in Losee vs. Buchanan, 51 N. Y. 476-487 after reviewing the Rylands case, asserts that the law laid down therein is :

"in direct conflict with the law as settled in this country. Here, if one builds a dam upon his own premises and thus holds back and accumulates the water for his benefit, or if he brings water upon his premises into a reservoir, in case the dam or the banks of the reservoir give away and the lands of a neighbor are thus flooded, he is not liable for the damage without proof of some fault or negligence on his part."

Citing Angell on Water Courses, Section 336 and many decision from other courts in this county.

Mr. Freeman, the editor of the American Decisions series of selected cases referring to the case of Rylands vs. Fletcher remarks in his note at 29 id. 149 that "the doctrine is not adopted in this country." That author points out also that Judge Oliver Wendell Holmes in a "very thoughtful article" in 14 Am. L. Rev. p. 1 criticises and condemns it.

Mr. Burdick in his text on the Law of Torts (4th Ed.) p. 14 asserts:

"The rule of Rylands v.| Fletcher, even with its recognized limitations, finds no great favor even in England, and American Courts have generally refused to follow it."

The same author in his text aforesaid p. 537 quotes Pollock, The Law of Torts (12th Ed.) 495-496 to this effect:

"'the tendency of later decisions has been rather to encourage the discovery of exceptions than otherwise. * * * No case has been found, not being closely similar in its facts, or within the same previously recognized category, in which the unqualified rule of liability without proof of negligence has been enforced.'"

The Supreme Court of Pennsylvania in Pennsylvania Coal Co. vs. Sanderson, 113 Pa. St. 126 has used this language:

"The doctrine declared in Fletcher v. Rylands, regarded as a general statement of the law, is perhaps not open to criticism in England, but it is subject to many and obvious exceptions there and has not been generally received in this country. A rule which casts upon an innocent person the responsibility of an insurer is a hard one at the best, and will not be generally applied unless required by some public policy, or the contract of the parties."

See also 1 Shear. & Redf. on Negligence (Revised Ed. 1941) p. 379 and 3 Id. p. 1775.

Mr. Bishop in his work "On Non-Contract Law", Section 839 in an elaborate note appended thereto discussing the Rylands vs. Fletcher case and the rule therein announced given above rather severely says:

"It is needless to say that such is *not* the law in any common-law country. * * * The reasoning, therefore, in this Fletcher and Rylands case, so far as it proceeds on ground other than negligence, is the individual reasoning of the judges, and not the reasoning of the law."

We find in 2 Harper's "Readings in Torts" (1941) the following language used which appears in 15 Texas Law Rev. 355:

"the courts in about half of our states have refused to follow the doctrine, either as expressed, or as limited by some of the American jurisdictions. At the same time, in at least nine states and the District of Columbia the doctrine has been followed, either by express approval of Rylands v. Fletcher, or by the application of a similar rule."

Cases are cited in the notes to the text which appear to uphold these statements.

Whatever may be the rule of decision in litigation closely similar in facts involved to those in the Rylands

vs. Fletcher case, there can be little doubt of the correctness of the conclusion at which we shall ultimately arrive in the cases at bar under their facts and the general findings of the District Court.

Wiel's Water Rights in the Western States (2d Ed.) pp. 256, 257 § 163 upon the authority of numerous cited cases states that:

"The use by means of ditches, flumes and similar apparatus is, of course, the most usual, and using the water in this way does not, by any means, make the appropriator an insurer of others against damage from breaking, overflow, seepage, or other escape of the water. The famous English case of Fletcher v. Rylands declared that a man builds a reservoir, or other works to hold water, at his peril. But such is not the law in the West. The ditch owner is not liable merely because the break or escape occurred, but only if it occurred through his negligence. Negligence must be shown. It is not even a case of *res ipsa loquitur* and negligence is not presumed from the mere fact that a break or escape occurred. The ordinary rule of negligence, that there must be a failure to use the care which an ordinary prudent man would have taken under the circumstances, applies."

So Mr. Chief Justice Potter in Howell vs. Big Horn Basin Colonization Co., 14 Wyo. 14, 36-37, 81 Pac. 785 established the position of this court on the matter discussed by Wiel in the excerpt above thus:

"The construction of ditches is one of the customary and recognized methods of appropriating water and conveying the same for use in irrigation and for other necessary purposes. It is the method more generally, and, indeed, almost universally employed. While those engaged in such an undertaking, attended with possible risks to others, should be answerable for the conduct thereof with diligence proportioned to the apparent risk, there is no substantial reason, we think, for holding them accountable as insurers, nor for injuries not attributable to some fault or negligence on their part." To the same effect is the case of Fleming vs. Lockwood,

36 Mont. 384, 92 Pac. 962, 13 A. & E. Ann. Cases 263. In the note appended to this case in the A. & E. Ann. cases it is said:

"It is well settled that the owner of an irrigation ditch is bound to exercise reasonable care and skill to prevent the ditch from causing injury to others. Consequently he is liable for all damages sustained by others as a result of his negligence or unskillfulness in constructing, maintaining, or operating the ditch." (Citing many cases including the Howell case supra from this jurisdiction).
The note then uses this language:

"*In General*—As appears from the rule stated above, the foundation of a ditch owner's liability for consequential damages is negligence. If he is not negligent, he is not liable. See also Parker v. Gregg, 136 Cal. 413, 69 Pac. 22; Messenger v. Gordon, 15 Colo. App. 429, 62 Pac. 959.

"*Inevitable Accident*—Likewise, where the injury is due to an act of God or an inevitable accident, the ditch owner is not liable. Thus, an irrigation canal owner is not liable for injuries resulting from a break in his canal which is caused by a storm of unprecedented severity. Grand Valley Irrigation Co. v. Pitzer, 14 Colo. App. 123, 59 Pac. 420."

The decisions of the appellate courts in Clark vs. Cedar County, 118 Neb. 465, 225 N. W. 235; Barnet vs. New York Central & H. R. R. Co., 222 N. Y. 195, 118 N. E. 625; Maplewood Farm Co. vs. City of Seattle, 38 Wash. 634, 153 Pac. 1061 declared that in order for a flood to come within the term "act of God" it should have been so extraordinary and unprecedented a manifestation of nature as could not have been reasonably anticipated or foreseen.

Similarly in a much later case from our adjoining state of Nebraska, Fairmont Creamery Co. vs. Thompson 139 Neb. 677, 298 N. W. 551, the court had occasion to define the term "act of God" and used these words: "Without detailing the evidence unduly, we are con-

vinced that the only logical conclusion which can be drawn is that the flood was of such an unprecendented and catastrophic nature that it falls within the legal definition of an act of God.

It has been correctly defined, we think, in the following language: 'An act of God', as the term is known to the law, is such an unusual and extraordinary manifestation of the forces of nature that it could not under normal conditions have been anticipated or expected. Southern R. Co. v. Cohen Weenen & Co., 156 Va. 313, 157 S. E. 563, 564.''

Another case from an adjoining state in our mountain plateau region where extremes of weather can arise such as have rarely occurred in the past is Peel vs. Chicago M. St. P. & P. R. Co., 94 Mont. 334, 22 Pac. (2d) 617. That was an action against a railroad company for flood damage caused by allegedly insufficient opening in a fill made by the company across a water course. The defendant denied any negligence on its part and as an affirmative defense asserted that on July 30, 1931 there was an unusual and unprecedented flood which was the cause of the damage.

The storm and flood which the defendant urged as a defense is thus described by the court:

"It is clear, however, that the storm of July 30, 1931, was extraordinary and unprecedented. Two witnesses living about two miles up "Sand Ditch" from the railroad fill C C 661, the one in question, testified that the worst storm they had experienced prior to July, 1931, occurred twenty or twenty-two years prior to that time. One of these witnesses, who resided in the same place in 1931, testified: 'I speak of those two as being the worst. The one in 1931 looked to me a good deal worse than the one twenty-two years ago.'

"Another witness, who had lived in the vicinity since 1912, said: 'I had lots of trouble up around my place the 30th day of last July. There is no comparison in the amount of water I saw that day as compared with water I have ever seen before up there; at least eight or ten times more than I ever see. I had never seen

high water up there before; we had big storms but nothing like that.' This witness further testified that whereas other storms had impaired the road to Butte, which he continually used, by washing out highway bridges and culverts, this storm had rendered the road absolutely impassable.

"Another witness living in the immediate vicinity said: 'I had never seen anything like it up there before in the twenty-two years I have been there. There were some storms but not like that one'. A witness from the same region testified: 'I never at any time in my experience living in that neck of the woods saw anything like that. It was the largest storm I ever saw. * * * I never saw anything like that in all the twenty-five years I lived up there. It was the worst I ever saw, nothing come close to it'."

Upon this record the court expressed its views as follows:

"Any fair consideration of all the evidence in the case indubitably must lead to the conclusion that the storm was of unusual, extraordinary, and unprecedented violence. No precedent for it is disclosed in the record. One noteworthy storm occurred twenty or twenty-two years previous to the one under consideration. That one, however, did not approximate this one. So far as the record is concerned, there never was a similare downpour in the region, either before or after the construction of the railroad grade. Likewise, the record is entirely devoid of testimony showing any other instance of water backing up from the culvert. All the testimony is to the effect that the drainage facilities met the requirements until the day of the storm in question. In the light of the facts, therefore, the results of the storm, in contemplation of law, were acts of God. Lyon v. Chicago, etc. Ry. Co., 45 Mont. 33, 121 P. 886; 27 R. C. L. 1106.' '

A somewhat analogous situation to that presented by the cases at bar is the question arising concerning the liability of a municipality where it constructs storm sewers sufficient under ordinary conditions but which are inadequate to carry surplus waters in consequence

of an "extraordinary" storm or flood, i. e., one that would not ordinarily be anticipated.

In Spitzer vs. City of Waterbury, 113 Conn. 84, 154 Atl. 157 the Connecticut Supreme Court of Errors dealt with a question of this character and concerning it said:

"If, however, the drains and sewers of a municipality are amply sufficient to meet all demands upon them under ordinary conditions, the municipality is not liable because they may prove inadequate to carry off the surplus waters from an extraordinary storm or flood. 43 Corpus Juris, 1136, § 1895; 6 McQuillan, Munic. Corp. (2d Ed.) § 2868. An extraordinary storm is not necessarily an unprecedented one, but one that happens so rarely that it is unusual and not ordinarily to be expected. Diamond Match Co. v. New Haven, 55 Conn. 510, 527, 13 A. 409, 3 Am. St. Rep. 70; Geuder v. Milwaukee, 147 Wis. 491, 133 N. W. 835; Richmond v. Wood, 109 Va. 75, 63 S. E. 449. The court has found, and this finding is not attacked, that the rainfall of August 10th and 11th was an unusual and almost unprecedented one, and that the entire storm water system of the defendant in this area was of sufficient size and construction to carry off such rainfall as would ordinarily be expected. This finding is decisive, adverse to the plaintiff's contention, as to the liability of the city, either on the ground of negligent construction or of a direct invasion of the plaintiff's rights by reason of a defective plan of construction."

The appellants come here with a general finding of the trial court against them. Concerning the effect to be given such a finding this court has said in Hinton vs. Saul 37 Wyo. 78, 259 Pac. 185 at 191 that:

"And in causes tried to a court, a general finding is one of the every special thing necessary to be found to sustain the judgment."

And in Wallis vs. Nauman, 61 Wyo. 231, 157 Pa. (2d) 285 it was pointed out that in Knaggs vs. Mastin, 9 Kan. 532, 533 the Supreme Court of Kansas in an opinion assented to by Mr. Justice Brewer said:

"'Where the facts are established by a general finding of a court, it must always be presumed that all the controverted facts are established in favor of the party for whom the court finds, and against the party against whom the court finds'."

See the Wallis case just cited also for other authorities on the same point. This rule is to be, of course, kept in mind in reviewing the record we have before us in order to reach a proper disposition of these cases in connection with that announced in the Willis case and subsequent decisions cited above.

We have already indicated that any alleged negligence on the part of the City on account of debris or weeds being left in the canal so as to obstruct the water flow therein has been negatived by the finding of the trial court. We have seen also that the rule in Rylands vs. Fletcher supra which would appear to be invoked by plaintiffs' initial pleadings can not be followed in view of the evidence herein and the weight of American authority on the point. It is likewise true that the District Court found upon substantial evidence, as we view it and as we think is reasonably shown by the review of the evidence herein as given above ,that the overflow in question was caused by an "act of God" as that term is defined by the decisions already mentiond. It is plain too, from the testimony of the expert witnesses for both parties that the sudden volume of waters from the melting snow in and around the City over-taxed the carrying capacity of the canal in question. There is substantial testimony to the effect that the capacity of the ditch was ample to meet the requirements of some thirty-five years of use thereof without injury to property in the City and until the 22nd day of January, 1943.

So far as the two low places in the north bank of the canal are concerned where the water overflowed, it is established by the testimony of the plaintiffs' own ex-

pert witness that an elevation of that bank for a height of only five inches with a width of less than twenty-five feet at the lowest point—and how much elevation or width at the other low place would have been sufficient to protect against the flood of water, the record does not show—would have been sufficient to have prevented an overflow of the water then. Nevertheless this witness also stated that the water "wouldn't have run over at the same time it did", i. e., that it would have run over later.

There is substantial evidence on which the trial court could base its general findings from which it can be inferred that no one could have reasonably expected that there would be an overflow at these slightly low places. That would appear to negative also the legal propriety, upon the record and findings of the trial court, of this court concluding that there was negligence on the part of the City. Indeed the plaintiffs' witness just mentioned stated, as we have already seen, that he saw the water in the ditch at 5:00 P. M. Jan. 22, 1943 but his trained eye had observed nothing then along the ditch that excited fear on his part "of anything happening to the ditch". As Bramwell, B. very well said in the rather unusual case of Carstairs vs. Taylor (1871) L. R. 6 Ex. 217 where a defendant was held not liable for a rat knawing a hole in a receptacle for the storage of water which flowed through a hole and injured plaintiff's property:

"Is there, then, any evidence of negligence? I think not. It is said there was negligence in so constructing the box that if a hole were made in this place the water would enter the warehouse. But how can it be said that there was negligence, when it was constructed in the way in which such things are ordinarily constructed? When it is repaired, it will probably be repaired in such a way that this accident cannot occur again; but, as I have often said, to treat this as evidence of negligence is to say that whenever the world grows wiser it con-

victs those that came before of negligence."

It must not be overlooked either as heretofore mentioned that the record herein shows that the trial judge at the request of the litigants and in the presence of counsel for all parties inspected the premises involved in these law suits. Under such circumstances we have heretofore said in Davis-Robinson vs. Patee, 49 Wyo. 470, 57 Pac. (2d) 681:

"It is to be observed that in addition to the evidence in the case being in the condition discussed above, the trial judge, as already has been noted, apparently with the consent of the parties, went to the premises of the owner and viewed the cement work which is the subject of this controversy. Under such circumstances, the findings of the trier of facts are entitled to especial weight and consideration in a reviewing court, and, to say the least, should not be set aside except for very strong and excellent reasons, as the following authorities will demonstrate:"

(Cases cited).

To the same effect is our case of Binning vs. Miller, 60 Wyo. 114, 146 Pac. (2d) 527.

There was some argument in respondent's brief to the effect that the maintenance of the ditch in question was a governmental function of the City and that City would therefore be immune from liability even if negligent. However we do not find it necessary to pass on this question for the reason that we find there was evidence to sustain the trial court's finding that the City was not negligent.

We find no other course left open to us, entertaining the views expresesd above resultant from a careful and painstaking examination of the record and the authorities deemed pertinent and persuasive touching on the questions therein involved, but to affirm the judgments of the District Court of Campbell County in both cases.

An order to that effect should and will be entered.

*Affirmed.*

KIMBALL, J., and TIDBALL, Dist. Judge, concur.

## ON PETITION FOR REHEARING

(February 11, 1947;

For former opinion, see 174 P. 2d 505.

In support of the Petition there was a brief by E. C. Raymond of Newcastle, Wyoming and R. G. Diefenderfer of Sheridan, Wyoming.

## OPINION ON REHEARING

RINER, Chief Justice.

A Petition for rehearing has been filed by appellants in these cases insisting that it was wrong for this court to adopt the view that no negligence on the part of the City had been established and that we ignored the duty resting upon the municipality "to inspect and maintain the ditch in a condition to carry off the water that might reasonably be anticipated to run through it." In these contentions we think appellants are mistaken. This court has said that: "Negligence consists of a violation of duty owing by one to another". Hines vs. Sweeney on Petition for Rehearing, 28 Wyo. 82, 89, 201

Pac. 1018. The Supreme Court of the United States in the case of the Baltimore & P. R. Co. vs. Jones, 95 U. S. 439, 24 L. Ed. 506, remarked that:

"Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. The essence of the fault may lie in omission or commission."

The duty imposed by law upon the City was not more than to so maintain that part of the Burlington Ditch which it had purchased as to meet all demands upon its capacity for carrying the water therein which could reasonably be expected to arise. The proofs in the record are such that the trial court could and did find that it had sufficiently performed that duty. It was under no obligation to anticipate such a flood of water pouring down the canal in question as had never before in the thirty-five years of its existence appeared. The most unusual and catastrophic nature of the flood of January 22, 1943 led one of the witnesses for the City who had lived in that vicinity for many years to state that he had never seen the water in the ditch as high as it was that night and also—to use his own words—"I never seen a flood like that in my life". In the original opinion herein it was pointed out that the expert witnesses on behalf of both parties agreed that more water came into this ditch when the phenomenal thaw occurred in consequence of the chinook wind than it was designed to carry. As we understand the record the failure or non-failure of the City to inspect the ditch had nothing to do with the unprecedented natural force which actually produced the damage in suit.

Complaint is made that the City did not keep "the banks" of the ditch "level". It will be recalled that the water where it overflowed was but three to four inches deep at the lowest part of the ditch according to the

plaintiffs' expert witness, Butler, and the width of this low place was less than twenty feet. But if these banks had been exactly level with no low places at all, this witness told counsel for appellants on his direct examination:

"Q.  Now, if the top of this bank, at the point 'A', and continuing along past the point 'B' had been level, instead of having these lower places in them, would the water have spilled over as it did, as you saw it?

"A.  Well, it wouldn't have done it as quick."

And on cross examination the same witness in response to practically the same question reiterated that statement in substantially these words: "Well, it wouldn't have run over at the same time it did". That is to say it would have done so later. This testimony was followed by another statement of Mr. Butler to this effect:

"No, I don't think it (the ditch at the low place) would have held it (the water)".

Additionally the Street Commissioner of the City who had examined the ditch before the flood in question testified:

"Q.  Did you notice that there was a low spot at the alley between Kendirck and Carey Avenues?

"A.  Well, something like that is hard to tell with a naked eye.

"Q.  Did you notice that?

"A.  I couldn't say I did, because there is ups and downs all along that ditch.

"Q.  It didn't occur to you that was too low a spot, where the water might spill out?

"A.  No, sir."

It would appear decidedly harsh to hold the City negligent in not keeping this bank level when neither the Street Commissioner nor plaintiffs' expert witness

Butler prior to the peak of the flood could see that the bank of the ditch was insufficient to hold the water. It evidently required surveyor's instruments to determine just how far from being exactly level the bank was. But aside from this fact entirely, it is evident that even if it had been level, the ditch would have overflowed there anyway. In other words the unprecedented flood waters were the direct cause of all the trouble, i. e., they were an "act of God" in the legal sense of that term, as the trial court concluded.

It is also urged that the record shows without dispute "that the bottom of the ditch raised .95 of a foot in its downward course". It would seem that the testimony to which appellants evidently refer is that of their expert witness, Butler, who took his measurements and platted a "longitudinal vertical cross section of this canal" February 20, 1944, nearly a year after the flood in question occurred. When asked whether the conditions of the ditch at the time he took the measurements were the same as they were when the flood took place on January 22, 1943, he responded "well, of course I couldn't say the bottom of the ditch was exactly the same"; that "he had observed no change between January 22, 1943 and February 20, 1944"; and that "the conditions were approximately the same". It will be noted that no time of day is specified relative to January 22, 1943 in the query or the several answers above mentioned and it will be remembered that during a substantial part of the day of the flood, the ditch bottom was under water. However, assuming the witness referred to that part of the day when the ditch bottom was more or less clear of water, the condition thereof was stated to be only an *approximate* estimate. As against this testimony there is the evidence of the expert witness for the City, Jesse E. Spielman, who said, as indicated in the original opinion, that the ten inches rise in the bottom of the ditch was

not the condition of the ditch when the flood took place and explained how the bottom of the ditch had been elevated by the action of the flood waters themselves. Upon this conflict in testimony, the trial court could reasonably conclude that at the time the flood came down the ditch, its bottom was not appreciably raised. Indeed, Mr. Butler himself said that late in the afternoon of January 22, 1943 he saw nothing which should cause alarm that the ditch would not properly function. We are, of course, bound by the trial court's findings upon disputed questions of fact where there is, as in this case, substantial evidence to support them and where the trial judge himself inspected the premises.

Much of the argument in the brief in support of the petition for rehearing could very well have been addressed to the trial court when the case was before it for disposition, but arrives too late here. We realize that counsel feel they should perform their full duty on behalf of their clients in presenting this matter and that we think they have done. We are obliged, however, to conclude that the views expressed and the result reached in the original opinion should stand and that the petition for a rehearing should accordingly be denied.

*Denied.*

KIMBALL, J. and TIDBALL, Dist. Judge, concur.