PRODUCERS LIVESTOCK MARKETING
ASSOCIATION, a Utah corporation,
Appellant (Plaintiff below),

v.

Thomas L. PARKER, d/b/a Parker Land and
Cattle Company, Appellee (Defend-
ant below).

No. 4151.

Supreme Court of Wyoming.

April 26, 1973.

W. A. Smith and Thomas T. Zollinger, Lander, for appellant.

Hettinger & Leedy and James L. Hettinger, Riverton, for appellee.

Before PARKER, C. J., and McEWAN, GUTHRIE and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

Plaintiff, alleging a contract in June of 1969 by which it was to purchase certain calves from defendant, its down payment of $7,000 thereon, and defendant's subsequent, unjustified breach of the agreement, sought return of the down payment, together with punitive damages. In an amended complaint plaintiff also alleged as a second count mutual mistake relating to the meaning of what constituted a "horn" and asked that the purported contract of sale be of no force and effect and that the parties be placed in status quo. Defendant admitted the execution of the agreement, denied all other allegations of the complaint, as well as averring that plaintiff's second count failed to state a claim upon which relief could be granted, and counterclaimed for his damages in excess of the $7,000 down payment. The court, sitting without a jury, issued a judgment allowing

defendant $5,976.20 as damages to be retained out of the $7,000 down payment, the remainder to be returned to plaintiff.[1] Appeal was taken therefrom, plaintiff urging its right to inspect and identify the cattle before acceptance, a denial of that right to be a breach of the contract, the evidence introduced to have been insufficient to show the calves merchantable, and the trial court's error in holding there was no mutual mistake of fact and that it was plaintiff's acts which amounted to a repudiation of the contract.

Consideration of these five charged errors indicates that it is neither necessary nor desirable to discuss each of them in detail but rather that the controversy be viewed overall, a perspective which discloses two basic facts to be resolved, (1) Was the plaintiff's conduct, as the trial court found, such as to be a repudiation of the contract; and (2) If so, what was the proper formula for the assessment of damages against plaintiff because of its repudiation?[2]

The primary undisputed facts are that plaintiff and defendant entered into a written agreement, on a printed form furnished by plaintiff, for the purchase of not more than 350 nor less than 325 steer calves weighing approximately 390 pounds at the price of $38 per hundredweight and a like number of heifer calves weighing approximately 370 pounds at $34 per hundredweight, the printed contract providing, inter alia:

" * * * All sorting to be done by Buyer.

* * * * * *

"The livestock covered by this contract * * * does not include any culled, sway backed, crippled, lump jaw, sick, blind, horned, stags, bulls, calvy heifers, or loco animals as determined by Buyer * * *." [3]

Plaintiff made a $7,000 down payment on the sales agreement to the defendant. On October 24, 1969, the mutually agreed date for delivery, plaintiff's employee, Jerry W. Goodwin, went to defendant's premises where the calves were to be loaded on trucks and taken to Riverton to be weighed. A dispute there arose, because of which the calves were not delivered to plaintiff but were transported by defendant to a livestock auction in Torrington where they were sold for amounts less than that provided in the sales agreement.

In the trial of the cause, there was a serious conflict as to what occurred at the ranch on October 24 and further details of the testimony as to occurrences at that time will hereafter be noted. In its argument on appeal plaintiff contends the evidence showed that its representatives were denied the right to sort or inspect the calves under the provisions of the agreement and under § 34–2–513, W.S.1957, 1971 Cum.Supp.; defendant responds that plaintiff's representative, Goodwin, chose not to reasonably exercise plaintiff's right to inspect and identify the calves to the contract but wanted to top the herd, saying, "I can take approximately 100 head," thereby repudiating the agreement.

Plaintiff, advancing numerous reasons, urges its right to have inspected the calves. Defendant concedes the validity of that position and acknowledges that under the contract, if not otherwise, the buyer had a right to sort the animals, but says that plaintiff rejected "goods" which conformed to the contract.

We examine the record then to ascertain whether or not there was substantial evidence to support the court's finding, "plaintiff's acts * * * amounted to re-

1. The trial court's findings indicate that the amount allowed defendant was the difference in price received from the sale and the price which he would have received under the sales agreement plus certain claimed costs of sale.

2. We deem plaintiff's argument as to mutual mistake insufficient to justify discussion.

3. In a handwritten portion of the contract, plaintiff agreed to accept up to 3 percent of horned calves.

pudiation of the contract, justifying defendant's invoking of W.S. § 34–2–703," and "that defendant [thereafter] sold substantially conforming goods in Torrington." In so doing, we of course bear in mind that an appellate court must assume the truth of the evidence in favor of the successful party, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P.2d 505, 506, 169 A.L.R. 502; 62 Wyo. 514, 177 P.2d 204. Unfortunately, the testimony does not disclose a fully definitive situation in which there was clear permission of the seller for inspection by the buyer, followed by a rejection. Instead, there were various peripheral statements by both parties, the meaning thereof depending upon interpretation. We consider the following excerpts from the testimony to be significant.

Goodwin said that while defendant's men were sorting the calves and cows he talked to defendant about the horns, and received the response, " 'What horns,' " Parker calling them scurs. Thereafter Goodwin said he went into the corral and began to work the calves, "taking the horned cattle and four hundred and fifty pound calves off," and after working approximately twenty-five or thirty head, Story, defendant's representative, came into the alley and told Goodwin he wasn't going to work his cattle in that manner, that there was no law or judge in the country that would say the cattle had horns. Goodwin testified he then suggested to Story that he read the contract and Story insisted Goodwin was not going to sort the cattle that way, that he would sell them elsewhere and go to court to see if the cattle did or didn't have horns. After some altercation, Goodwin said he called his superiors in Salt Lake and returned, telling Story his manager had informed him not to take the cattle unless defendant would make them conform to the contract.

Story's version of the matter was at some variance. He testified that some three weeks before the date set for delivery Goodwin had told him, " '* * * I don't have the cattle sold. I am in trouble with them, I can't move them because the price * * * [is] off.' " He said that on October 24 before the cows had been separated from the calves Goodwin made the comment that the cattle were big and that he didn't want them, to which Story responded that as soon as they got them in and sorted off they wouldn't look as big. After they had started to sort the cattle, Story said Goodwin asked, " 'Well, what are we going to do about the horns?' " Story testified he had responded that he didn't think the horns were that important, that Goodwin was protected on the horns and weight of the cattle, the contract stating he didn't have to take more than 3 percent with horns nor anything over 450 pounds. Subsequently after more calves had been separated from the cows further conversations ensued, and Story asked Goodwin how many cattle he wanted or could take; Goodwin said he could take approximately a hundred head. Story told him he wouldn't consider a hundred head —he wouldn't let him cut the bunch for a hundred head. Goodwin then left to make a phone call and when he came back said he had talked to his people and they didn't want to change. Story said he again asked Goodwin "if a hundred head was all he wanted" and was told yes, that was about all he could take, whereupon Story told him, "I wouldn't let anybody do that"; Goodwin then said, " 'Well, I would like to have my seven thousand dollars back.' " On cross-examination Story testified that they did not sort any calves. Asked, "There were never any of the calves taken out of the pens and put into the main alley," he answered, "At no time." "Q. In other words, Mr. Goodwin never tried to sort any?" "A. No."

■ The occurrences on the day set for delivery of the calves were matters properly within the primary determination of the trial court; and without either attempting

to indicate how we would have viewed the situation or approving the specific findings of the trial court, we think the evidence, interpreted as it must be in an appeal, was sufficient to have warranted the finding of that court as to the repudiation. Various happenings might have appropriately led to that result—as examples, Goodwin's statement that he could not move the cattle because the price was off, his subsequent failure at the time of delivery to sort the calves he considered acceptable under the contract from those he did not, and his saying that a hundred head "was all he wanted."

Passing then to the question of defendant's damages, as we interpret the briefs there is no disagreement between the parties as to the applicable statutes governing the seller's remedies, which of course bear upon the damages properly allowable to him and to the amount of the judgment. In that regard, plaintiff says, "In order to resell the goods in accordance with Section 34–2–703 and Section 34–2–706(2) [W.S. 1957, 1971 Cum.Supp.] and recover damages thereunder, the Seller *must first identify the goods* to the contract pursuant to * * * § 34–2–704(1)(a) [W.S.1957, 1971 Cum.Supp.]." (Emphasis supplied by plaintiff.) Although defendant is less specific, he arrives at the same conclusion when he says, "The appellee, having elected to proceed under § 34–2–703 * * * [§ 34–2–703(d) states that the recovery of damages is as provided in § 34–2–706] made the identification to the contract of conforming calves, necessary under § 34–2–704." [4]

It follows then that both parties agree there must be an identification of the goods claimed to be conforming and that the resale must, in accordance with the last sentence of § 34–2–706(2), be reasonably

identified as referring to the property covered in the contract alleged to have been broken.[5] The difficulty in the present controversy arises in the disparate approach of the parties as to whether or not the calves sold by defendant in Torrington were identified as those which, although conforming to the contract, had been rejected by the buyer. On that aspect, plaintiff urges, "The only manner in which this [identification] could be done would be to sell livestock pursuant to identical qualifications as embodied in the contract. At no point did Defendant attempt to perform his duty under W.S. § 34–2–704(1)(a) of identifying the livestock to the contract."

To this defendant responds:

"* * * Defendant's Exhibits 1 and 2 * * * evidenced the sale by the appellee, at the Torrington Livestock Commission Company of Torrington, Wyoming, on October 29, 1969, of six hundred ninety head of calves. A recapitulation of those exhibits * * * discloses that in each instance in which a calf weighed over four hundred and fifty pounds, its value was deducted in determining the appellee's damages, as was the value of other calves which were obviously not of merchantable quality because the prices for which they sold were far less than the five hundred and twenty-two head sold which conformed to the contract. Mr. Story testified that eight per cent of the calves were Angus, which do not have horns * * *, and that less than three per cent of the calves had horns * * *. Mr. Maxfield, of the Torrington Livestock Commission Company, testified that on the day of sale he sold three to four thousand head of other calves; that the prices paid for appellee's calves were comparable to the prices paid for other calves sold; and

4. "An aggrieved seller under the preceding section may identify to the contract conforming goods not already identified if at the time he learned of the breach they are in his possession or control." Section 34–2–704(1)(a), W.S.1957, 1971 Cum.Supp.

5. "* * * The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." Section 34–2–706(2), W.S.1957, 1971 Cum.Supp.

that, in his opinion, if a substantial number of calves had horns that fact would have resulted in lower prices \* \* \*."

Story's testimony concerning the 3 percent was explicit. He indicated that this percentage had been inserted into the printed contract prior to its execution because it had been his estimate that no attempt would be made to dehorn approximately 3 percent of the calves. He also made it clear that the 3 percent referred to at the time of the trial concerned "the calves that had never been dehorned by anybody." Giving the Maxfield testimony mentioned by defendant every favorable inference, it was that he did not count "horns" but that the calves would not have brought the price they sold for had more than *10 percent* had horns.

■ The trial court in its judgment excluded as comparable goods those animals weighing over 450 pounds as well as certain others not of merchantable quality—totaling some 160 head. However, the judgment does not reflect that the court took cognizance of the fact that there was nothing in the record to show that 97 percent of the calves sold were without horns. Since the contract allowed only for 3 percent to have horns, this means that the record is void of evidence concerning whether or not 7 percent of the animals sold conformed to the contract in that respect. It is uncontroverted that both parties on October 24 were aware of a question concerning whether or not some of the calves did or did not have horns, and there would appear to be no reason why defendant could not have placed himself in a position to adduce accurate proof on this facet. We, therefore, remand the cause to the trial court so that it may consider this lack of evidence as to 7 percent of the calves and make a further deduction from the award of damages to defendant.

Remanded with instructions.